## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. THE CHEROKEE NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  CIV-16-1354-C |
| | ) | |
| 1. THE DEPARTMENT OF THE | ) | |
| INTERIOR; | ) | |
| 2. SALLY JEWELL, Secretary of the | ) | |
| Interior; | ) | |
| 3. THE BUREAU OF INDIAN AFFAIRS; | ) | DEMAND FOR |
| 4. LAWRENCE ROBERTS, Acting | ) | JURY TRIAL |
| Assistant Secretary-Indian Affairs; | ) | |
| 5. THE OFFICE OF | ) | |
| THE SPECIAL TRUSTEE FOR | ) | |
| AMERICAN INDIANS; | ) | |
| 6. VINCENT G. LOGAN, Special Trustee | ) | |
| for American Indians; | ) | |
| 7. THE OFFICE OF TRUST FUND | ) | |
| MANAGEMENT; | ) | |
| 8. NEIL KORNZE, The Director | ) | |
| of the Bureau of Land Management; | ) | |
| 9. THE BUREAU OF LAND | ) | |
| MANAGEMENT; | ) | |
| 9. THE OFFICE OF NATURAL | ) | |
| RESOURCES REVENUE; and | ) | |
| 10. GREGORY J. GOULD, Director of the | ) | |
| Office of Natural Resources Revenue; | ) | |
| 11. THE UNITED STATES | ) | |
| DEPARTMENT OF THE TREASURY; | ) | |
| 12. JACOB J. LEW, The Secretary of the | ) | |
| Treasury; and | ) | |
| 13. THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1.      This lawsuit intends to resolve accounting and related equitable claims that the Cherokee Nation (herein the "Nation") brings against the United States of America (herein the "United States" or the "Government")[1] and a number of its agencies and bureaus directly and through the agencies' and bureaus' directors acting in their official capacity relating to the Government's management of the Cherokee Nation's Trust Fund (hereinafter the "Trust Fund"), including money generating obligations owed by the Government to the Nation.

2.      Within the Trust Fund, the United States held and managed vast resources for the Nation including, *inter alia*, money; proceeds from the sale of land or profits from the land; money from surface leases for agriculture, surface, oil and gas mining leases, coal leases, sand and gravel leases, businesses, and town lots; income from property owned by the Nation; buildings; the Nation's records; and money resulting from treaties or other agreements. Each of the items in the Trust Fund are subject to specific trust duties set out in treaties, statutes, regulations, executive orders, and agency directives as generally described herein.

3.      In this complaint, the Nation invokes its right to an accounting for the Trust Fund as a beneficiary of the Government's trusteeship. While this is a discrete matter, the resolution of these claims will strengthen the working relationship between the Nation and the Government and thereby further the opportunity for development and progressive

---

[1]      Unless listed or described separately, "United States" or "Government" refers to all defendants, including the United States of America.

activities that benefit the Nation, the communities in which the Nation is located, and the United States generally.

## I.   PARTIES[2]

4.      "[T]he Cherokee people have existed as a distinct national community, in the possession and exercise of the appropriate and essential attributes of sovereignty, for a period extending into antiquity beyond the dates and record and memory of man[.] [T]hese attributes, with the rights and franchises which they involve, have never been relinquished by the Cherokee people, but are now in full force and virtue." Resolution of the Cherokee National Committee at Aquohee Camp, Aug. 1, 1838. "[T]he inherent sovereignty of the Cherokee Nation, together with the constitution, laws, and usages of the same, are, … in full force and virtue, and shall continue so to be in perpetuity … [T]he Cherokee people … do not intend … as compromitting, in any manner, their just claim against the United States … ." *Id.*

5.      The Nation and the Government entered into numerous treaties and other agreements throughout the years and continue to enter into various agreements. At other times, the Government unilaterally took control of the Nation's Trust Funds pursuant to statute, regulation, administrative order, or executive order and without the agreement of the Nation.

6.      The Nation is acknowledged by the United States Government as a federally recognized Indian Tribe.

---

[2]      The Cherokee Nation's claim for an accounting relates only to lands, funds, monies, and assets owned by the Nation and <u>not</u> to lands, funds, monies, and assets owned by any individual citizen of the Nation.

7. The Nation's boundaries encompass all or part of fourteen counties in what is now the northeastern part of Oklahoma.

8. The Cherokees have a vibrant and unique cultural, social, and military heritage. The Nation is one of the so-called "five civilized tribes," along with the Chickasaws, Choctaws, Creeks, and Seminoles.

9. The Department of the Interior ("Interior") is a federal agency with the responsibility to provide for the effective management of, and accountability for, the proper discharge of trust responsibilities, to Indian tribes, including the Nation. The trust responsibility of Interior includes the obligation to properly manage assets held in trust for the Nation, and to account for, manage, and reconcile the Nation's corresponding trust accounts and records. This responsibility is undertaken, in part, by many of the "sub-bureaus" and "sub-agencies" of Interior. Sally Jewell is currently the Secretary of Interior, and she is added hereto as a Defendant in her official capacity, and not personally.

10. The Bureau of Indian Affairs is a sub-bureau of, and an agency within, Interior that has the responsibility for carrying out substantial trust responsibilities to the Nation. Lawrence Roberts is currently the Assistant Secretary for Indian Affairs and is named as a defendant in his official capacity, and not personally.

11. The Office of the Special Trustee for American Indians is a sub-agency within Interior that has the responsibility of carrying out substantial trust responsibilities to the Nation. Vince Logan is currently the Special Trustee for American Indians, and he is added hereto as a Defendant in his official capacity, and not personally.

12.    The Office of Trust Fund Management is a sub-agency within Interior that has substantial responsibility for the management of the Nation's trust accounts.

13.    The Bureau of Land Management is a sub-agency within Interior that has substantial responsibility for the management of the Nation's trust assets. Neil Kornze is the Director of the Bureau of Land Management, and is named as a Defendant in his official capacity, and not personally.

14.    The Office of Natural Resources Revenue (ONRR) is an office within Interior that succeeded to many of the duties and responsibilities of the former Mineral Management Service (MMS).    The ONRR currently, and the MMS before it, has substantial responsibility for the management of the Nation's trust assets, including the management of land, natural resources, oil, gas, and coal and the revenues that may be derived from that land.    Gregory Gould is the Director of the ONRR, and he is named hereto as a Defendant in his official capacity, and not personally.

15.    The Department of the Treasury ("Treasury") is a federal agency with the responsibility to provide for the effective management of Indian tribal trust funds and accountability for the proper discharge of trust responsibilities on behalf of Indian tribes, including the Nation.  The trust responsibilities of the Treasury include the responsibility to properly manage, account for, and reconcile the Nation's Trust Funds.  Jacob Lew is currently the Secretary of the Treasury, and he is named as a Defendant in his official capacity, and not personally.

16.    The United States of America is that legal entity constituted on September 17, 1787, and which articles of constitution came into effect on March 4, 1789, thereafter

being amended and modified from time to time. Pursuant to Article I, Section 8, Clause 3 of such Constitution, the United States Congress has the authority for the United States of America "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Pursuant to that power, the United States of America has pervasively managed and controlled the Trust Funds. The United States of America has acknowledged its obligation to account to the Nation for the management and control of the Trust Funds, including in various treaties and agreements with the Nation, in federal statutes, and by the decisions of its Courts.

## II.   HISTORICAL BACKGROUND AND INTRODUCTION

17.    Trust relations between the Nation and the United States were formalized in numerous treaties between 1785 and 1871, in later agreements, and in unilateral actions by Defendants.

18.    The first treaty between the Nation and the United States is the Treaty of Hopewell, 7 Stat. 18 (Nov. 28, 1785), which focuses on peace and the treatment, release, and exchange of prisoners and the enslaved. Article 4 addresses "hunting grounds" of the Cherokee and provides a description of this tract of land. The United States agreed the Cherokees were to have exclusive control over this land. The ninth article provides that the United States has "the sole and exclusive right of regulating the trade with the Indians and managing all their affairs in such manner as they think proper."

19.    The second treaty between the Nation and the United States is the Treaty of Holston, 7 Stat. 39 (July 2, 1791). This treaty also focuses on peace between the parties. Article 4 outlines the borders of the Cherokee Nation – boundaries which were to be

officially marked by the parties. The Nation agreed to cede any land "to the right of" that boundary. Consideration for the cession included the United States' commitment to pay the Nation $1,000 each year. Article 7 provides United States assurances to Cherokee Nation that the Nation will maintain sovereignty over all lands not ceded.

20.   The third treaty between the Nation and the United States is the Treaty of Philadelphia, 7 Stat. 42 (Feb. 17, 1792), which amended the Holston treaty to increase the United States' annual payment to $1,500 for the lands ceded at Holston.

21.   The fourth treaty between the Nation and the United States is the Treaty of Philadelphia, 7 Stat. 43 (June 26, 1794), which was a second amendment to the Treaty of Holston and required the mapping of the land ceded. The financial consideration for the Holston land cessions was increased to $5,000 annually, payable in "goods suitable for the [Cherokee Nation's] use" (Art. 3).

22.   The fifth treaty between the Nation and the United States is the Treaty of Tellico Blockhouse, (Nov. 8 1794). It was a peace treaty between the United States and Lower Cherokee which ended the Chickamauga wars and restated boundaries from the Holston Treaty which were never fully ascertained.

23.   The sixth treaty between the Nation and the United States is the Treaty of Tellico, 7 Stat. 62 (Oct. 2, 1798). Despite the Treaty of Holston and its amendments, the Government's assertion of the physical boundaries of the Nation's Lands still had not been fully laid out or marked by the United States in the 13 years available to do so. Because the United States failed to mark the boundaries, non-Cherokee settlers were enabled to enter Cherokee land. Additional land cessions were agreed to, in exchange for

the United States' "protection". Article 4 describes the ceded land. In Article 6, the United States agreed to a onetime payment of $5,000 in "goods, wares and merchandise" and an annual payment of $1,000 in "other goods." These payments were "in addition to the annuity already provided for." The United States also "guarantee[d] of the remainder of their country forever." The 1798 Tellico Treaty reaffirmed the prior treaties, indicating it was "additional to, and forming a part of, treaties already subsisting between the United States and the Cherokee Nation".

24. The seventh treaty between the Nation and the United States is the Treaty of Tellico, 7 Stat. 288 (Oct. 24, 1804), in which the Cherokee Nation ceded land containing "Wafford's Settlement" and received from the United States a commitment to make payments of $5,000 (one time) and $1,000 (annually).

25. The eighth treaty between the Nation and the United States is the Treaty of Tellico, 7 Stat. 93 (Oct. 25 1805), in which the Cherokee Nation ceded land to the United States. In consideration for the cessions, the United States agreed to pay the Nation $3,000 immediately plus $11,000 within ninety days, as well a $3,000 "annuity." It is believed that the term "annuity" meant at that time an obligation by the United States to pay the Nation $3,000 each year after the treaty. In the year 1805, the United States agreed the yearly 'annuity' amounted to $10,000. 7 Stat. 43, 62, 93; *Cherokee Tr. Funds*, 117 U.S. 288, 296, 6 S. Ct. 718, 720 (1886).

26. The ninth treaty between the Nation and the United States is the Treaty of Tellico, 7 Stat. 95 (Oct. 27, 1805), where the Nation ceded land for the creation of the State Assembly of Tennessee and the United States agreed to pay the Nation $1,600.

27.     The tenth treaty between the Nation and the United States is the Treaty of Washington, 7 Stat. 101 (Jan. 7, 1806).  In it, the Cherokee Nation ceded land and received total financial consideration of $10,000 to be paid in yearly installments of $2,000.  In addition, the United States agreed to build a grist mill "for the use of the Nation" and the United States agreed to provide the Nation with "a machine for cleaning cotton."  Article 4 provides that the United States "will secure to the Cherokees the title to the said reservations" (set out at the beginning of the treaty) "in such manner as will be equitable."

28.     The eleventh treaty between the Nation and the United States is the Elucidation of a convention with the Cherokee Nation, 7 Stat. 103 (Sept. 11, 1807).  The Elucidation clarifies the lands Cherokees ceded by the Washington Treaty of 1806 to include the land between the Tennessee River and Tennessee Ridge.  In consideration for ceding any claims to this land, the United States agreed to pay $2,000 upon demand by the Nation. The Nation reserved hunting access on the land ceded "until by the fullness of settlers it shall become improper."

29.     The twelfth treaty between the Nation and the United States is the Treaty of Washington, 7 Stat. 138 (Mar. 22, 1816), where the Cherokee Nation ceded its last remaining lands within the limits claimed by South Carolina.  The United States "promise[d] and engage[d] that the State of South Carolina shall pay to the Cherokee nation" $5,000.

30.     The thirteenth treaty between the Nation and the United States is the Treaty with the Cherokee, 1816, 7 Stat. 139 (Mar. 22, 1816), which attempted to resolve the dispute

over the boundary between Creek and Cherokee on the Coosa River.  This agreement established a manner to lay out and mark the boundary.  This was a resolution to the dispute which arose from the Treaty of Fort Jackson.  Additionally, Article 5 provided that the United States would pay damages for losses the Cherokee Nation incurred as a result of the Creek Wars.

31.     The fourteenth treaty between the Nation and the United States is the Treaty of Chickasaw Council House, 7 Stat. 148 (Sept. 14, 1816), where the Cherokee Nation ceded land and the United States agreed to pay the Nation $5,000 as well as "an annuity" of $6,000 per year for ten years "as compensation for any improvements."

32.     The fifteenth treaty between the Nation and the United States is the Treaty of the Cherokee Agency, 7 Stat. 156 (July 8, 1817).  It provided financial incentives and practical assistance to those Cherokees who chose to emigrate west (to what became Arkansas) and offered one acre in the western lands for every one acre ceded in the eastern lands, as well as compensation for improvements that were left behind.  Article 4 provides a method for dividing the yearly "annuity" payments between those who removed and those who did not.  The treaty provides that the "parties," which includes the Nation, shall have "free navigation of all the waters mentioned."

33.     The sixteenth treaty between the Nation and the United States is the Treaty of Washington, 7 Stat. 195 (Feb. 27, 1819), which affirms the Treaty of the Cherokee Agency (1817), but fails to define any western boundary of the Cherokee Reservation in Arkansas.  The Tellico land reservation is "ceded to the United States, in trust for the

Cherokee Nation as a school fund; to be sold by the United States and the proceeds invested as is hereafter provided in the fourth article of this treaty." Article 4 states:

> The United States stipulate that the reservations, and the tract reserved for a school fund, in the first article of this treaty, shall be surveyed and sold in the same manner, and on the same terms, with the public lands of the United States, and the proceeds vested, under the direction of the President of the United States, in the stock of the United States, or such other stock as he may deem most advantageous to the Cherokee nation. The interest or dividend on said stock, shall be applied, under his direction, in the manner which he shall judge best calculated to diffuse the benefits of education among the Cherokee nation on this side of the Mississippi.

Under Art. 6 of the 1819 Washington Treaty, the "annuity to the Cherokee nation shall be paid, two-thirds to the Cherokees east of the Mississippi, and one-third to the Cherokees west of that river." The Treaty also provides for the development and lease of a roadway to the Unicoy Turnpike Company.

34.     The seventeenth treaty between the Nation and the United States is the Treaty of Washington, 7 Stat. 311 (May 6, 1828), which redraws the western boundary of the State of Arkansas, and then establishes the western Cherokee lands to the West of Arkansas as a "home that shall never, in all future time, be embarrassed by having extended around it the lines, or placed over it the jurisdiction of a Territory or State, nor be pressed upon by the extension, in any way, of any of the limits of any existing Territory or State" in what would later become the State of Oklahoma. The United States promised "to possess the Cherokees, and to guarantee it to them forever, and that guarantee is hereby solemnly pledged, of seven millions of acres of land, to be bounded as follows . . . ." The United States also granted to the Cherokee Nation "a free and unmolested use of all the Country lying West of the Western boundary of the above described limits, and as far West as the

sovereignty of the United States, and their right of soil extend." The United States agreed to pay for the value of improvements lost in Arkansas and to build a new grist and saw mill. Article 5 specified a number of payments (including famously a payment of $500 to Sequoyah for the Cherokee Alphabet). The money the United States promised the Nation was to be used for various things, including a school fund, to buy a printing press, and to construct new buildings. In Article 9, a 2-by-6-mile reservation of lands to the United States is made for Ft. Gibson for the "accommodation of the military force."

35.     The eighteenth treaty between the Nation and the United States is the Treaty of Ft. Gibson, 7 Stat. 413 (Feb. 14, 1833), that renewed the United States's guarantee to the Nation of the seven million acres, the perpetual outlet for the Nation west of those lands, and the free and unmolested use of the country west. *Cherokee Tr. Funds*, 117 U.S. 288, 300, 6 S. Ct. 718, 722 (1886). The 1833 Treaty also resolved a boundary line dispute between the Cherokee Nation and the Creek Nation. Article 4 required the building of blacksmith shops and for installing "railway corn mills." Article 6 provided for a 1-square-mile area of land to be set aside for the "Cherokee Agency."

36.     The nineteenth treaty between the Nation and the United States is The Unratified Agreement with the Cherokee of 1835, Sen. Doc. No. 120 (Mar. 14, 1835). This was an unratified document that did not become legally binding, but would have provided for the removal of the remaining Eastern Cherokees to the Western lands that were identified in the 1828 Treaty at Washington. It would have created a $4.5 Million fund, and would have commuted the Cherokee Nation's educational annuities to a fund administered by

the United States.  It also provided the Nation with a reversionary interest in the Union Mission Station as well as Fort Gibson if the respective reservation were ever abandoned.

37.     The twentieth treaty between the Nation and the United States is the Treaty of Camp Holmes (or the Treaty with the Comanche and others), 7 Stat. 474 (Aug. 24, 1835). It included the Cherokee Nation as a party and at Article 4 provided that "It is understood and agreed by all the Nation or tribes of Indians parties to this treaty, that each and all of the said Nation or tribes have free permission to hunt and trap in the Great Prairie west of the Cross Timber, to the western limits of the United States."

38.     The twenty-first treaty between the Nation and the United States is the Treaty of New Echota, 7 Stat. 478 (Dec. 29, 1835).  This is the final Cherokee removal treaty where the Cherokees "in the East" agree to removal to the "west."  The Treaty of New Echota is very similar to the unratified Agreement with the Cherokee from March 1835. The Treaty of New Echota ceded all land east of the Mississippi to the United States in exchange for $5,000,000, two tracts of land, and the use of "all the country west of the western boundary."  The first tract of land is the Seven Million acres described in the treaties of 1828 and 1833.  The Treaty of New Echota states that land was to be "conveyed by patent."  The second tract is approximately 800,000 acres, which the United States conveyed to the Nation "by patent, in fee simple."  Article 3 of the Treaty of New Echota provides that all lands, including the "outlet" were to be conveyed in "one patent."  That patent excepted the Military reservation at Ft. Gibson.  And, Article 3 provided that if Ft. Gibson were abandoned, the land would revert to the Cherokee Nation.  Article 10 created a "permanent fund" for the Cherokee Nation that shall be

invested "in some safe and most productive public stocks of the country for the benefit of the whole Cherokee nation." Article 11 commuted Cherokee Nation annuities for education into a one-time, lump sum payment. Article 12 also created a fund of $100,000 for the "poorer class of Cherokees as shall remove west." In a supplementary agreement (May 23, 1836) this "poor persons' fund" was subsumed into the Cherokee National fund.

39.     On the 12th of July, 1839, the following act of union between the Eastern and Western Cherokees was adopted: "Therefore we, the people composing the Eastern and Western Cherokee Nation, in national convention assembled, by virtue of our original unalienable rights, do hereby solemnly and mutually agree to form ourselves into one body politic, under the style and title of the Cherokee Nation." The Cherokee Nation further agreed that "all rights and titles to public Cherokee lands on the east or west of the River Mississippi, with all other public interests which may have vested in either branch of the Cherokee family, whether inherited from our fathers or derived from any other source, shall henceforward vest entire and unimpaired in the Cherokee Nation as constituted by this union." On Sept. 6, 1839 the Nation adopted a written constitution, in which it is recited that the Eastern and Western Cherokees had become reunited in one body politic, under the style and title of the Cherokee Nation. *Cherokee Tr. Funds*, 117 U.S. 288, 305, 6 S. Ct. 718, 725 (1886).

40.     The twenty-second treaty between the Nation and the United States is the Treaty of Washington, 9 Stat. 871 (Aug. 6, 1846). In light of the United States' failure to issue a patent to the Cherokee Lands, and mismanagement of the New Echota Treaty fund, there

was an agreement on how the United States would account for the monies from the New Echota Treaty that the United States mishandled. The 1846 Treaty of Washington provides for additional payments to the Cherokee Nation, including, *inter alia*, for the purchase of a printing press and $20,000 for the Cherokee School fund.

41.    On the 6th of August, 1857, Special Order 114 was issued by the War Department to vacate Fort Gibson. Pursuant to this Order, the Fort was abandoned within the subsequent month. In accordance with the terms of Article 3 of the Treaty of New Echota, the property was to revert back to the Nation. By November of the same year, the Nation had established the town of Kee-too-wah on the land.

42.    The twenty-third treaty between the Nation and the United States is the Treaty of 1866, 14 Stat. 799 (July 19, 1866). Relevant to this Complaint for an accounting, the Nation agreed in Article 15 that its lands East of 96° may be sold to members of other Indian Tribes and that those tribes east of the 96° were to become part of the Cherokee Nation. The Nation agreed in Article 16 that tribes may purchase lands from the Cherokee Nation West of the 96°. Various tribes purchased land west of the 96°, including the Osage Nation.

43.    In a separate provision of the Treaty of 1866, the United States took the Cherokee lands in Kansas "in trust" to sell it "to the highest bidders for cash" and at not less than the appraised value. The United States was also authorized under the treaty to sell the Cherokee lands in Kansas in one tract "for cash" for a sum not less than one dollar per acre.

44.    The Treaty of 1866 Article 22 provides:

The Cherokee national council, or any duly appointed delegation thereof, shall have the privilege to appoint an agent to examine the accounts of the nation with the Government of the United States at such time as they may see proper, and to continue or discharge such agent, and to appoint another, as may be thought best by such council or delegation; and such agent shall have free access to all accounts and books in the executive departments relating to the business of said Cherokee Nation, and an opportunity to examine the same in the presence of the officer having such books and papers in charge.

14 Stat. 799 (July 19, 1866).

45.     The Treaty of 1866 Article 23 provides:

All funds now due the nation, or that may hereafter accrue from the sale of their lands by the United States, as hereinbefore provided for, shall be invested in the United States registered stocks at their current value, and the interest on all said funds shall be paid semi-annually on the order of the Cherokee Nation, and shall be applied to the following purposes, to wit: Thirty-five per cent. shall be applied for the support of the common-schools of the nation and educational purposes; fifteen percent for the orphan fund, and fifty percent for general purposes, including reasonable salaries of district officers; and the Secretary of the Interior, with the approval of the President of the United States, may pay out of the funds due the nation, on the order of the national council or a delegation duly authorized by it, such amount as he may deem necessary to meet outstanding obligations of the Cherokee Nation, caused by the suspension of the payment of their annuities, not to exceed the sum of one hundred and fifty thousand dollars.

14 Stat. 799 (July 19, 1866).

46.     The Treaty of 1866, Article 31, reaffirmed all prior treaties not inconsistent with the terms of the 1866 treaty.

47.     The twenty-fourth treaty between the Nation and the United States is the Treaty of Washington, 16 Stat. 727 (April 27, 1868). This treaty, which was a 'supplement' to the Treaty of 1866, relates back to Article 2 of the Treaty of New Echota that provided for 800,000 acres of additional land (in what became Kansas) to be patented to the

Cherokees.  The land in question was commonly known as the "Neutral Lands" – a strip 50 miles long and 25 miles wide in what is today Kansas.  Before their sale to the Cherokee Nation, the Neutral Lands were originally set aside to separate the Osage Nation reservation from the settlers in what would become Kansas.  Because of a failure by the United States to protect the Neutral Lands, they were overrun by non-Cherokee settlers, and the Neutral Lands were considered by some to be open to homestead settlement even though they were owned by the Cherokee Nation.  The tract was the subject of at least two Civil War battles to control it, and then in 1866 it was the subject of the treaty with the United States which provided for Defendants to take the land "in trust" and to sell it.  On August 30, 1866, then-Secretary of the Interior James Harlan sold the Neutral Lands to the American Emigrant Company.  The American Emigrant Company made a down payment with payments to continue in the future.  Two days later, Orville Browning was appointed as Secretary of the Interior.  He set aside the contract with the American Emigrant Company because he determined that the Treaty of 1866 required a single cash payment.  Browning, on October 9, 1867, sold the neutral lands to his brother-in-law, James F. Joy, for the same terms (down payment, with additional payments over time) that he found illegal in the sale to the American Emigrant Company.  The Washington Treaty of 1868 addressed the conflict between the two competing purchase agreements.  Several homesteaders brought suit in the District Court of Kansas seeking title to the land they believed they had rightfully claimed.  Ultimately the Supreme Court held that the United States had title to the Neutral Lands and successfully conveyed title to Joy and resolved the matter in Joy's favor.  No mention

was made of the Nation's right to an accounting for the sale of the lands which were held by Defendants "in trust" pursuant to the Treaty of 1866. *See Holden v. Joy*, 84 U.S. 17 (1872). The Cherokee Nation was not a party to the *Joy* case, though the case discusses various Cherokee treaties with Defendants.

48.     During the Civil War, due to Defendant's failure to adequately protect the Cherokee people and their property, the town of Kee-too-wah was overtaken by Confederate troops for a period of time. Control of the town was wrested by Union soldiers and, pursuant to a January 25, 1870 Executive Order, Fort Gibson was formally re-established as a military post and subsequently occupied by the United States. In February 1891, by Executive Order, the Fort was relinquished to Interior. Interior reports to Congress in 1892 stated that the Fort, which by Interior estimates was comprised of roughly 5,500 acres, would "[p]robably revert to the Indians." (emphasis added). The original land reservation for Fort Gibson was for 7,680 acres. Reservations for a cemetery (*see* Executive Order of February 9, 1891) and a quartermaster depot and supply center for Fort Sill (*see* General Order 22, Department of Missouri, September 30, 1871) were made but no accounting to the Nation has been located. Moreover, no records indicate that Fort Gibson ever did in fact revert to the Nation.

49.     Starting in 1872, Congress began unilaterally passing specific statutes relevant to and controlling items within the Cherokee Trust Funds. The first of these was The Act of May 11, 1872, 17 Stat. 98, which provided for the sale of the "Cherokee Strip," which is a two-mile-wide tract of land lying between Kansas and Oklahoma along much of their length. The 1872 Act provided that all money from the sale of the Cherokee Strip "shall,

without unnecessary delay," be invested in the registered five percent (5%) U.S. bonds. It also provided that the sale of lands shall not take place until the provisions of the act were accepted by the Cherokee national council, or its delegation.

50.   The second specific Act of Congress relevant to Cherokee Trust Funds was The Act of Feb. 14, 1873, 17 Stat. 437, which at section 4 set apart from the funds belonging to the Cherokee Nation for the creation of three social welfare programs:  an orphanage, an asylum, and a school for indigent persons.  These programs were to be created "under such rules and regulations as the national council of the Cherokees may prescribe."

51.   The third specific Act of Congress relevant to Cherokee Trust Funds was The Act of March 3, 1873, 17 Stat. 530.  It placed the funds resulting from the sale of Cherokee lands to the Osage Nation "on the books of his Department to the credit of the Cherokee Indians, the same shall bear interest at the rate of five per cent . . . ."

52.   The fourth specific Act of Congress relevant to Cherokee Trust Funds was The Act of Feb. 28, 1877, 19 Stat. 265, which provided that funds from the sale of the Cherokee Strip lands were to be "paid into the Treasury of the United States, and placed to the credit of the Cherokee Nation, and shall be paid to the treasurer of the Cherokee Nation, on the order of the legislative council of the Cherokee Nation."

53.   The fifth specific Act of Congress relevant to Cherokee Trust Funds was The Act of Aug. 7, 1882, 22 Stat. 349, which provided congressional authority for the Cherokee Nation to lease the salt deposits west of the 96° longitude, with the lease terms to be not less than one dollar per ton of salt, and with the lease subject to the approval of the Secretary of the Interior.

54.     The sixth specific Act of Congress relevant to Cherokee Trust Funds was The Act of Mar. 3, 1883, 22 Stat. 582.  It permitted the Eastern Band of Cherokee Indians to sue "to determine the rights of the said band in and to the moneys, stocks and bonds, held by the United States in trust for the Cherokee Indians, arising out of the sales of lands lying west of the Mississippi River, and also in a certain other fund, commonly called the permanent annuity fund . . . ."  Ultimately the Supreme Court held, in the case authorized by this statute that there is "no just ground on which the claim of the [Eastern Band of Cherokees] can rest to share in either of the funds held by the United States in trust for the Cherokee Nation".  *Cherokee Tr. Funds*, 6 S. Ct. 718, 729 (1886).

55.     The seventh specific Act of Congress relevant to Cherokee Trust Funds was The Act of Oct. 19, 1888, 25 Stat. 608, which provided for per capita distributions within the Nation to "blood" Cherokees as well as freedmen, Shawnee, and Delaware Indians.  The distributions, totaling $375,000, were charged against the Nation's funds to compensate Cherokee individuals for the tracts selected from the Cherokee Outlet by other tribes.

56.     The eighth specific Act of Congress relevant to Cherokee Trust Funds was The Act of Feb. 25, 1889, 25 Stat. 694, which was a jurisdictional statute permitting the "Western Cherokee Indians" to adjudicate certain claims relating to a report of the Secretary of the Interior showing that the United States failed to make certain required payments.  Citing mistaken understandings, the U.S. Supreme Court ultimately affirmed a judgment against the United States.  *See United States v. Old Settlers*, 13 S. Ct. 650 (1893).

57.    The ninth specific Act of Congress relevant to Cherokee Trust Funds was The Act of Mar. 1, 1889, 25 Stat. 783, which *inter alia*, permitted the Cherokee Nation to issue coal leases for longer than ten years.

58.    The tenth specific Act of Congress relevant to the Cherokee Trust Funds was The Act making appropriations for the then-current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June 30, 1889, and for other purposes, of Mar. 2, 1889, 25 Stat. 1005, where the President was authorized to appoint three commissioners to negotiate cessions by the Indian tribes owning lands lying west of the ninety-sixth degree of longitude in the Indian Territory.

59.    The first Presidential Proclamation relevant to Cherokee Trust Funds was the Proclamation of February 17, 1890, 26 Stat. 1577, which stated that the Cherokee Nation's use of its own lands in what was known as the "Cherokee Outlet" for grazing was "prejudicial to the public interests" and the President ordered the cattle grazing on the Cherokee Nation's Outlet to be removed not later than October 1, 1890.

60.    The eleventh specific Act of Congress relevant to Cherokee Trust Funds was The Act of May 2, 1890, 27 Stat. 81, which created the Territory of Oklahoma in Indian Country.  This contained provisions for the inclusion of the Cherokee Outlet within the Territory "[w]henever the interest of the Cherokee Indians in the land . . . shall have been extinguished and the President shall make proclamation thereof. . ."

61.    The twelfth specific Act of Congress relevant to Cherokee Trust Funds was The Act of March 3, 1893, 27 Stat. 612, which was the creation of the Dawes Commission.

Additionally, the United States agreed to provide to the Cherokee Nation a "complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years 1817, 1819, 1825, 1828, 1835–6, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect . . . ." The funds from the cession of the outlet were to obtain 5% interest when left on deposit in the Treasury. A limited review of financial information was performed, and even though more than One Million Dollars was owing to the Cherokee Nation, only $432.28 was ever paid to the Cherokee Nation. *Cherokee Nation v. United States*, 40 Ct. Cl. 252, 332 (1905).

62.   The thirteenth specific Act of Congress relevant to Cherokee Trust Funds was The Act of August 15, 1894, 28 Stat. 286, which directed certain funds be placed "on the books of the Treasury Department, to the credit of the Cherokee Nation of Indians" and that those funds were to earn interest at 5%.

63.   The fourteenth specific Act of Congress relevant to Cherokee Trust Funds was The Act of March 2, 1895, 28 Stat. 764, which directed the Attorney General to review and make a "restatement" of the accounting completed under The Act of March 3, 1893, 27 Stat. 612.

64.   The fifteenth specific Act of Congress relevant to Cherokee Trust Funds was The Act of June 10, 1896, 29 Stat. 321, which provided additional funding and authority for the Dawes Commission to continue the United States' unethical, illegal, and immoral dealings with the Cherokee Nation which resulted in the Government's wrongful disposition of the Nation's Trust Funds. The Government's illegal actions resulted, for

22

instance, in the tribal "governments" wrongly being referred to by the Government as "clubs."

65.    The Cherokee Nation is not a club, has never been a club, and should never been referred to by the United States as a club.  Instead, since time immemorial, the Cherokee Nation has been and continues to be a sovereign government which has made this claim against the Defendants as trustees for the management of the Cherokee Nation's trust resources.

66.    The sixteenth specific Act of Congress relevant to Cherokee Trust Funds was the "Curtis Act," 30 Stat. 495 (June 28, 1898), which, among other things, provided at Section 11 for the allotment of the Cherokee Nation's lands while specifically reserving to the Cherokee Nation "oil, coal, asphalt, and mineral deposits" and stating that "no allotment of such lands shall carry the title to such oil, coal, asphalt, or mineral deposits." Various other tribal reservations were made.  The United States took over total control of the Nation's land; its oil, coal, asphalt, and mineral deposits; and all of the Nation's money.  This Act also required that after allotment and reservations (expressly providing for missions, schools, and burial grounds) had been fully completed "When such allotment of the lands of any tribe has been by them completed, said commission **shall make full report thereof** to the Secretary of the Interior for his approval."

67.    The second Presidential Proclamation relevant to Cherokee Trust Funds was the Proclamation of July 27, 1898, 30 Stat. 1779, where the Government declared the Cherokee Nation's saline reserves "public domain."

68.     The seventeenth specific Act of Congress relevant to Cherokee Trust Funds was The Timber and Stone Act, 31 Stat. 660 (June 6, 1900), which made it illegal to cut Cherokee timber or mine Cherokee stone without permission from Defendants.

69.     The eighteenth specific Act of Congress relevant to Cherokee Trust Funds was Congress' ratification of The Cherokee Allotment Agreement, 32 Stat. 716 (July 1, 1902).  The Cherokee Allotment Agreement specifically invalidated Section 13 of the Curtis Act and stated "no Act of Congress or treaty provision inconsistent with this agreement shall be in force in said Nation except sections fourteen and twenty-seven of [the Curtis Act]."  The Cherokee Allotment Agreement did not invalidate Section 11 of the Curtis Act.

70.     The nineteenth specific Act of Congress relevant to Cherokee Trust Funds was The 1906 Act for the Five Tribes, 34 Stat. 137 (Apr. 26, 1906), which, *inter alia*, placed control over land records with the U.S. Courts, placed control over the Cherokee Schools with Defendant Interior, placed control over all Cherokee money with Defendant Interior, reserved coal and asphalt land from sale, placed control over all buildings owned by the Cherokee Nation with Defendant Interior, provided for the continuation of allotment and the sale of unallotted lands, authorized Defendant Interior to collect and recover land or money owned by the Nation, and prohibited the Nation's land from becoming public land.

71.     The twentieth specific Act of Congress relevant to Cherokee Trust Funds was The Act of April 30, 1908, 35 Stat. 70, which commanded the Secretary of the Interior to take possession of, appraise, and sell "all buildings on lands belonging to the Five Civilized

Tribes, now or heretofore used for governmental, school, or other tribal purposes, together with the furniture therein and the land appertaining thereto . . . ."

72.     The twenty-first specific Act of Congress relevant to Cherokee Trust Funds was The Act of Apr. 4, 1910, 36 Stat. 269, that required Defendants to account for the Nation's money, among other things.

73.     The twenty-second specific Act of Congress relevant to Cherokee Trust Funds was The Act of Mar. 3, 1911, 36 Stat. 1058, that required Defendants to account for the Nation's money, among other things.

74.     The twenty-third specific Act of Congress relevant to Cherokee Trust Funds was The Act of Aug. 24, 1912, 37 Stat. 518, which required Defendants to account for the Nation's money, among other things, and prohibited the expenditure of "tribal funds" except in certain limited instances.

75.     The twenty-fourth specific Act of Congress relevant to Cherokee Trust Funds was The Act of June 30, 1913, 38 Stat. 77, which required that the "Secretary of the Interior shall cause a system of bookkeeping to be installed in the Bureau of Indian Affairs" on or before July 1, 1914.

76.     The twenty-fifth specific Act of Congress relevant to Cherokee Trust Funds was The Act of August 1, 1914, 38 Stat. 582, which abolished the Commissioner of the Five Tribes, required the collection of rents on unallotted land and tribal buildings, and prohibited the expenditure of "tribal funds" except in certain limited instances.

77.     The twenty-sixth specific Act of Congress relevant to Cherokee Trust Funds was The Act of May 18, 1916, 39 Stat. 123, which required Defendant Secretary of the

Treasury to account for "the receipts to, and expenditures which the Secretary of the Interior recommends to be made for the benefit of the Indians from, all tribal funds of Indians for the ensuing fiscal year . . . ." It also required the Bureau of Efficiency to "prepare and submit to the Secretary of the Interior a system of bookkeeping and accounting for the Bureau of Indian Affairs that will enable the said Secretary, on or before July first, nineteen hundred and seventeen, to meet the requirements of section twenty-six of the Indian Appropriation Act approved June thirtieth, nineteen hundred and thirteen . . . ."

78.     The twenty-seventh specific Act of Congress relevant to Cherokee Trust Funds was The Act of March 2, 1917, 39 Stat. 969, which authorized "hearings [to] investigate the conduct of the Indian Service" and to "to examine into the conduct and management of the Bureau of Indian Affairs and all its branches and agencies, their organization and administration, to examine all books, documents, and papers in the said Bureau of Indian Affairs . . . ."

79.     The twenty-eighth specific Act of Congress relevant to Cherokee Trust Funds was The Act of March 3, 1919, 40 Stat. 1316, which waived Defendants' immunity for certain claims by the Cherokee Nation.

80.     The twenty-ninth specific Act of Congress relevant to the Cherokee Trust Funds was The Act of March 19, 1924, 43 Stat. L. 27, which waived Defendants' immunity for certain claims by the Cherokee Nation.

81.     The thirtieth specific Act of Congress relevant to the Cherokee Trust Funds was The Act of April 25, 1932, 47 Stat. 137, which waived Defendants' immunity for certain claims by the Cherokee Nation.

82.     The thirty-first specific Act of Congress relevant to the Cherokee Trust Funds was The Act of March 27, 1934, 48 Stat. 501, authorizing the placement of the Cherokee Nation's official records, by Defendants, in the offices of the State of Oklahoma's Historical Society.

83.     The thirty-second specific Act of Congress relevant to the Cherokee Trust Funds was the Indian Claims Commission Act of 1946, 60 Stat. 1049.  It established a forum for certain Indian claims against the United States, waived Defendant's immunity, established a statute of limitations on certain claims, and provided certain specific procedures and protocols.

84.     The thirty-third specific Act of Congress relevant to the Cherokee Trust Funds was The Act of March 30, 1968, 82 Stat. 70, which transferred certain Chilocco Indian School lands at Chilocco, Oklahoma, to the Cherokee Nation.

85.     The thirty-fourth specific Act of Congress relevant to the Cherokee Trust Funds was The Act of October 21, 1970, 84 Stat. 1074, which transferred certain lands to the Cherokee Nation.

86.     The thirty-fifth specific Act of Congress relevant to the Cherokee Trust Funds was The American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239.

87.     The thirty-sixth specific Act of Congress relevant to the Cherokee Trust Funds was The Act of December 13, 2002, 116 Stat. 2851, which settled claims brought by the

Nation for inaction and mismanagement by Defendants of specific trust lands and resources along the Arkansas Riverbed.

88.    The Cherokee Nation has been a party to numerous lawsuits before the Indian Claims Commission which are related to various Cherokee Trust Funds and are identified by Docket Nos. 2, 24, 26, 42, 123, 173, 173A, 190, 271, 282, 282A-L, and 297.  None of the claims, orders, or decisions in those lawsuits limit the claim the Nation makes for an accounting or for restitution in this lawsuit.

89.    The Cherokee Nation has been a party to numerous lawsuits and appeals in other federal courts that relate to various elements of the Cherokee Trust Fund.  Those lawsuits are addressed in the following orders:  *Cherokee Trust Funds*, 6 S.Ct. 718 (1886); *The Western Cherokee Indians v. United States*, 27 Ct. Cl. 1 (1891); *Journeycake v. Cherokee Nation*, 28 Ct. Cl. 281 (1893);  *United States v. Old Settlers*, 13 S.Ct. 650 (1893); *Journeycake v. Cherokee Nation*, 15 S.Ct. 55 (1894); *Whitmire v. Cherokee Nation*, 30 Ct. Cl. 138 (1895); *Stephens v. Cherokee Nation*, 19 S. Ct. 722 (1899); *Cherokee Nation v. Hitchcock*, 23 S.Ct. 115 (1902); *Delaware Indians v. Cherokee Nation*, 38 Ct. Cl. 234 (1903); *Delaware Indians v. Cherokee Nation*, 24 S. Ct. 342, (1904); *Cherokee Nation v. United States*, 40 Ct. Cl. 252 (1905); *United States v. Cherokee Nation*, 26 S.Ct. 588 (1906); *Cherokee Nation v. United States*, 59 Ct. Cl. 862 (1924); *Cherokee Nation v. United States*, 46 S.Ct. 428 (1926); *Eastern Cherokees v. United States*, 82 Ct. Cl. 180 (1935); *Cherokee Nation v. United States*, 82 Ct. Cl. 456 (1936); *Cherokee Nation v. United States*, 102 Ct. Cl. 720 (1945); *Cherokee Nation v. United States*, 109 F. Supp. 532, 124 Ct. Cl. 315 (1953); *Choctaw Nation v. Oklahoma*, 396 U.S. 620 (1970); *United*

*States v. Cherokee Nation*, 474 F.2d 628 (Fed. Cir. 1973); *United States v. Cherokee Nation*, 480 U.S. 700 (1987). None of the claims, orders or decisions in those lawsuits limit the claim the Nation makes for an accounting and for restitution in this lawsuit.

### III. JURISDICTION AND VENUE

90.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1361 and 1362; 28 U.S.C. §§ 2201 and 2202; and 5 U.S.C. §§ 702 and 706. The Nation makes no claim here for money damages.

91.    Through a series of appropriations acts,[3] Congress waived the United States' sovereign immunity to suit and deferred accrual of potential claims until each Indian tribe receives a meaningful accounting.

92.    Venue is proper in this court under 28 U.S.C. § 1391 because the Nation's claims for an accounting are equitable, and a significant part of the events and omissions basing this suit, as well as some of the Trust Funds managed by Defendants are or have been located within the Western District of Oklahoma, including without limitation the Government's management of the portions of the Trust Funds relating to the Cherokee Outlet, the Cherokee Strip, the Cherokee Saline Deposits, and the Chilocco School Grounds.

---

[3]    *See* Pub. L. No. 102-154, 105 Stat. 990 (1991); Pub. L. 102-381, 106 Stat. 1374 (1992); Pub. L. No. 103-138, 107 Stat. 1379 (1993); Pub. L. No. 103-332, 108 Stat. 2499 (1994); Pub. L. No. 104-134, 110 Stat. 1321 (1996); Pub. L. No. 104-208, 110 Stat. 3009 (1996); Pub. L. No. 105-83, 111 Stat. 1543 (1997); Pub. L. No. 105-277, 112 Stat. 2681 (1998); Pub. L. No. 106-113, 113 Stat. 1501 (1999); Pub. L. No. 106-291, 114 Stat. 922 (2000); Pub. L. No. 107-63, 115 Stat. 414 (2001); Pub. L. No. 108-7, 117 Stat. 11 (2003); Pub. L. No. 108-108, 117 Stat. 1241 (2003); Pub. L. No. 108-447, 118 Stat. 2809 (2004); Pub. L. No. 109-54, 119 Stat. 499 (2005); Pub. L. No. 110-161, 121 Stat. 1844 (2007); Pub. L. No. 111-88, 123 Stat. 2904 (2009).

## IV.   UNITED STATES' CONTROL OVER THE NATION'S GOVERNMENT AND ASSETS

93.     The Nation's government has been in continual existence since time immemorial through the date this document is signed below. Nonetheless, starting in the late 1890s, the United States illegally and wrongfully controlled the Cherokee Nation's government, taking control over all of the Nation's property, and managing the Nation's affairs.

94.     After Oklahoma statehood in 1907, defendants illegally refused to recognize tribal governmental actions, refused to release tribal funds, and misinterpreted the law to justify their position that the chiefs of the Five Tribes could only be appointed by federal officials.

95.     The Nation adopted a new Constitution in 1976 pursuant to the Nation's inherent sovereign authority. Prior to 1976, the Nation continued to exercise governmental authority but the citizens of the Nation were denied the basic rights common to any democracy in that they were deprived of the right to choose their own public officials by free and open elections. They were also denied the right to remove officials who failed in their duties. And, importantly to this action, the United States controlled the Tribe's government and made all choices concerning the Nation's Trust Funds.  These actions were all found to be contrary to law in *Harjo v. Kleppe*, 420 F. Supp. 1110 (D.C. Cir. 1978). As recognized in the *Harjo* decision:

> The available evidence clearly reveals a pattern of action on the part of the Department and its Bureau of Indian Affairs designed to prevent any tribal resistance to the Department's methods of administering those Indian affairs delegated to it by Congress. This attitude, which can only be characterized as bureaucratic imperialism, manifested itself in deliberate attempts to frustrate, debilitate, and generally prevent from functioning the

30

tribal governments expressly preserved by § 28 of the [Five Tribes] Act [of April 26, 1906, 34 Stat. 137].

*Id.* at 1130.

96.     The last popularly elected principal chief of the Nation was William C. Rogers. After his elected term expired, Rogers became the first of many federally appointed chiefs of the Nation.

97.     Tribal affairs continued and when the United States needed a signature on behalf of the Nation, the President would appoint a "chief" for the Nation for the purpose of providing such a signature.   These "chiefs" were illegally treated by Defendants as the sole repository of the Nation's governmental authority even though the United States exercised complete control over tribal budgets, expenditure of tribal funds, sale or lease of tribal assets, collection of debts, and prosecution of claims on behalf of the Nation. The citizens of the Nation were denied the basic rights common to any democracy in that they were deprived of the right to choose their own public officials by free and open elections.   They were also denied the right to remove officials who failed in their duties.

98.     As a result, and for example, a process of appointing a "Chief for a Day" developed by Defendants, whereby Defendants appointed an individual as "chief" for a singular day.   Such individuals included Edward M. Frye, Richard B. Choate, Charles J. Hunt, Oliver H.P. Brewer, Jr., and William W. Hastings.

99.     The United States did not require its appointed chiefs to maintain any records of their actions.   In 1906 the United States took control of the Nation's records.   When the passed a new constitution in the 1970s, the United States returned few, if any, records

memorializing the actions taken by United States Government on behalf of the Nation for the prior nearly seventy years, nor did the United States return to the Nation the complete records from times prior to 1907 that the United States took from the Nation. Instead, Defendants took the Nation's records, placed some of the Nation's records in various federal repositories and placed other of the Nation's records in the historical archives of the State of Oklahoma. The United States never provided the Nation with a record of the actions taken in the name of the Nation after the United States illegally usurped the Nation's governmental powers, nor has the United States sought to restore the historical records which it continues to keep from the Nation.

## V.     UNITED STATES' TRUSTEESHIP

100.    Defendants have always had, and continue to have, a continuing duty to account to the Nation for their management and control over Cherokee Trust Funds.

101.    Defendants have acknowledged their duty to account to the Cherokee Nation on numerous occasions:

        A.      In the Treaty of Washington, 9 Stat. 871 (Aug. 6, 1846) the United States agreed to account for the monies from the New Echota Treaty that the United States mishandled.

        B.      In the Treaty of 1866 the United States agreed to provide the Nation with the ability to inspect any of its accounts at any time (Art. 22).

        C.      In The Act of Mar. 3, 1893, 27 Stat. 612, the United States agreed to provide to the Cherokee Nation a "complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years 1817,

1819, 1825, 1828, 1835–6, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect … ."

D.     The Act of Mar. 2, 1895, 28 Stat. 764, directed the Attorney General to review and make a "restatement" of the accounting completed under The Act of Mar. 3, 1893, 27 Stat. 612.

E.     The Act of Apr. 4, 1910, 36 Stat. 269, required Defendants to account for the Nation's money, among other things.

F.     The Act of Mar. 3, 1911, 36 Stat. 1058, required Defendants to account for the Nation's money, among other things.

G.     The Act of Aug. 24, 1912, 37 Stat. 518, required Defendants to account for the Nation's money, among other things, and prohibited the expenditure of "tribal funds" except in certain limited instances.

H.     The Act of June 30, 1913, 38 Stat. 77, required that the "Secretary of the Interior shall cause a system of bookkeeping to be installed in the Bureau of Indian Affairs" on or before July 1, 1914.

I.     The Act of May 18, 1916, 39 Stat. 123, required Defendant Secretary of the Treasury to account for "the receipts to, and expenditures which the Secretary of the Interior recommends to be made for the benefit of the Indians from, all tribal funds of Indians for the ensuing fiscal year … ." It also required the Bureau of Efficiency to "prepare and submit to the Secretary of the Interior a system of bookkeeping and accounting for the

33

Bureau of Indian Affairs that will enable the said Secretary, on or before July first, nineteen hundred and seventeen, to meet the requirements of section twenty-six of the Indian Appropriation Act approved June thirtieth, nineteen hundred and thirteen … ."

J.  The American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239, restates the preexisting requirement for the Secretary of the Interior to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to section 162a of this title."

K.  The American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239, requires the Secretary of the Interior to attest that it has provided the Cherokee Nation with "as full and complete accounting as possible of the [Cherokee Nation's] funds to the earliest possible date … ."

L.  The American Indian Trust Fund Management Reform Act of 1994, 108 Stat. 4239, restates the Secretary of the Interior's longstanding obligation to, *inter alia*, provide "adequate systems for accounting for and reporting trust fund balances," and to "[a]ppropriately manag[e] the natural resources located within the boundaries of Indian reservations and trust lands" which are a part of the Cherokee Trust Fund.

34

M.    The Indian Trust Asset Reform Act of 2016, Pub L. 114-178, reaffirms the United States' duties to the Cherokee Nation under the treaties and laws set out herein, while continuing to modify the federal systems that have thus far not implemented the federal trust duties regarding the Trust Funds, including the United States' duty to account for the Trust Funds.

N.    Other federal statutes, regulations, manuals, directives, policies, and orders impose a duty on the United States to account to the Nation for the United States' management the Cherokee Trust Funds.

102.   In 1898, the United States passed the Curtis Act which required a number of changes relating to the lands, assets, and funds of the Nation.[4]

103.   In 1902, the Cherokee Nation ratified an agreement with the United States concerning the manner of allotment set out by the Curtis Act.

104.   The Curtis Act and the 1902 Agreement required the allotment of the Nation's lands to its Citizens under a process conducted by the Government.  Tribal citizens were to receive, "land equal in value to one hundred and ten acres of the average allottable lands of the Cherokee Nation, to conform as nearly as may be to the areas and boundaries established by the Government survey, which land may be selected by each allottee so as

---

[4]    Act of June 28, 1898, 30 Stat. 495.

to include his improvements."[5]   During the first half of the 20th Century, the Government allotted the Nation's lands.

105.   No accounting for the allotment of the Nation's lands was provided to the Nation.

106.   No accounting for reservations from the Nation's lands was provided to the Nation.  Such reservations were made for, *inter alia*, cemeteries, schools, missions, and churches.  Some of these reservations provided the Nation with a reversionary interest in the lands if the land ceased to be used for its reserved purpose or was otherwise abandoned.

107.   Following and during the process of allotment, the Government sold property referred to as "surplus lands" that were owned by the Nation but managed in trust by the Government for the Nation's benefit.  To date, no accounting for the disposition of these Surplus Lands has been provided by the Government to the Nation.

108.   The Government was not authorized to dispose of the Nation's interest in these Surplus Lands as part of the property interests equitably owned by the Nation, *qua* beneficiary of the Government's trusteeship, in the manner in which these lands were disposed.

109.   The Curtis Act reserved oil and gas and minerals underlying allotted land to the Cherokee Nation.  The oil and gas and minerals (hereinafter, "Mineral Assets") reserved by the Curtis Act belong to the Cherokee Nation.  The Government was not authorized to

---

[5]      1902 Agreement at § 11.

dispose of the Nation's interest in the Mineral Assets that were reserved by the Curtis Act.

110.   Later, the 1906 Act for the Five Tribes permitted the sale of certain lands.

111.   It is believed that some of the Nation's lands were never sold, but the Nation does not know exactly what lands were sold and not sold.

112.   Within the Trust Fund, the United States held and managed vast resources for the Nation including, *inter alia*, land, surface leases for agriculture, oil and gas mining leases, coal and mineral leases, sand and gravel leases, businesses, town lots, income from property owned by the Nation, and monetary funds.

113.   The United States never provided a full and complete accounting to the Nation for its management of the Trust Fund.

## V.   RELEVANT FEDERAL ACCOUNTING ACTIVITIES AND FINANCIAL CONCEPTS

114.   The General Accounting Office ("GAO") is an agency of the United States that issues accounting pronouncements relevant to various departments and activities of the federal government.

115.   On information and belief, when the United States received funds in respect to transactions involving the Nation's property interests, the appropriate financial and accounting records were not created by the United States to accurately record or disclose such transactions and dealings involving the Nation's properties and assets.

116.   Accordingly, the United States must correct all erroneous (and incomplete) accounting and financial records to accurately reflect details of transfers, deposits, and all other transactions involving the Nation's properties held in trust by the United States.

117.   SSFAS No. 5 is one source of federal financial regulations that addresses the methodology for federal entities, such as Interior, to follow with regard to accounting to the Nation.

118.   Accordingly, Government is obligated to account for and recognize its responsibility to bear the estimated costs to restore the Nation's trust funds that have been depleted as a result of the Government's failure to account for or manage the Trust Funds in accordance with the Government's trust duties.

119.   Until very recently when the Nation began to exercise more of its inherent sovereignty, Interior and its sub-agencies took upon themselves the responsibility of managing the Nation's resources, including the management of mineral exploration and development, and the use of Cherokee land for economic development.

120.   The Government has substantial responsibilities for the management of the Trust Fund.  In 1994, Congress required the United States to provide the Nation, and all other Native American Indian Tribes, with reconciled account statements for their Tribal Trust Accounts by September 30, 1995.

121.   As recited herein, the United States committed to provide an accounting to the Nation of the Trust Fund, at least twice per year.

122.   The 1994 Reform Act was codified at 25 U.S.C. § 4044, which states:

The Secretary shall transmit to the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate, by May 31, 1996, a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995. In carrying out this section, the Secretary shall consult with the Special Trustee. The report shall include--

(1) a description of the Secretary's methodology in reconciling trust fund accounts;

(2) attestations by each account holder that--

   (A) the Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled by the Secretary; or

   (B) the account holder disputes the balance of the account holder's account as reconciled by the Secretary and statement explaining why the account holder disputes the Secretary's reconciled balance; and

(3) a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute.

123.   Even while Congress required Defendants to account, the Bureau began a preliminary assessment of its duty to reconcile trust fund transactions in March 1992.  As a part of that assessment, Defendants decided to only perform reconciliation for the time period 1973-1992. Defendants subsequently decided to add the time period 1993-1995.

124.   Defendants also later agreed upon "procedures" that would be used in the reconciliation project.   Even though the Federal Government's contractor for this reconciliation, Arthur Anderson, stated in the report that was transmitted to the Nation that the reconciliation project required an accounting to the Nation for its Trust Funds, the agreed upon procedures did not allow Arthur Anderson or Interior to provide the required accounting to the Nation.

125.   Beyond Defendants' admission that the reconciliation was not the accounting that was required by the 1994 Reform Act, there were many deficiencies in Defendants' "procedures" for the reconciliation project, and in the project itself.  These include: (i) a failure to perform the accounting as required by the 1994 Reform Act; (ii) a scope limitation on the reconciliation project to the 20-year time period 1972-1992 (Congress did not place a temporal limitation on Interior's responsibility to provide an accounting, but stated the accounting should extend back to "the earliest possible date"); (iii) a failure to properly analyze the management and investment of the tribal trust accounts; and (iv) a failure to analyze Interior's and Interior's sub-agency's management of the Nation's trust assets, including the mineral and estate assets held in trust for the Nation.

## VI.    CAUSE OF ACTION

## FIRST COUNT:  ACCOUNTING

126.   Paragraphs 1 through 125 are incorporated by reference.

127.   The Nation has substantial interests in Trust Funds that are held, and managed, by the United States or have been subject to the United States' trusteeship.  These Trust Funds were obtained variously by treaty, other agreements, or by congressional or administrative action.

128.   The United States is required to provide an accounting of the Trust Funds held or managed by the United States, or which have otherwise been subject to the United States' trusteeship, including all elements of the Trust Fund described herein.

129.   The fact that an accounting has not been provided by the United States for the management of the Trust Fund constitutes an illegal deprivation of the Nation's interests

and has impermissibly impacted the Nation's ability to govern itself and its people, or to provide greatly needed services and economic development in the Nation's community.

130.    An example of a portion of the Trust Fund that the United States has not accounted for is the saline deposits described herein.  In 1893, the President of the United States, by proclamation took the Nation's saline deposits and sold them notwithstanding the Aug. 7, 1882 Act provided that the leasing of "said salines shall continue" subject to express, limited provisions which were not at issue.  No accounting for those actions nor for the moneys received have ever been provided to the Cherokee Nation.[6]

131.    An additional example, the United States acted as a trustee pursuant to specific federal statutes mandating action benefiting the Nation, including *inter alia*: 1) The Act of June 28, 1898 requiring among other things that mineral interests be reserved to the Cherokee Nation, all lands not reserved under the statute be allotted to the members of the Cherokee Nation; 2) The Act of June 6, 1900, 31 Stat. 66, as amended on January 21, 1903, 32 Stat. 774, prohibiting cutting of Timber on Cherokee lands; 3) The Act of April 26, 1906, which placed control over land records with the U.S. Courts, placed control over the Cherokee Schools with Defendant Interior, placed control over all Cherokee money with Defendant Interior, reserved coal and asphalt land from sale, placed control over all buildings owned by the Cherokee Nation with Defendant Interior, provided for

---

[6] While the Saline Deposits are referenced, they are only one example of the Government's failure and refusal to account for the management of the Nation's Trust Funds. The demand for an accounting relates to the Nation's entire Trust Funds including, without limitation, all lands owned by the Nation which the Government sold at least in part to pay money or other items to the Nation; all leases; all minerals; all rights of navigation; all rights to hunt and fish; and all moneys.

the continuation of allotment and the sale of unalloted lands, authorized Defendant Interior to collect and recover land or money owned by the Nation, and prohibited the Nation's land from becoming public land; and 4) various regulations permitting the leasing of land, oil, gas, town lots, and buildings.

132.   The Nation seeks an Order from this Court compelling the United States to provide an accounting for all elements of the Trust Funds that are held or have been held by the United States *qua* trustee for the Nation, including without limitation those elements described as examples of the Trust Fund.[7]

## SECOND COUNT:
## ACCOUNTING AS A FEDERAL TRUST RESPONSIBILITY

133.   Paragraphs 1 through 132 are incorporated by reference.

### *A. ACCOUNTING*

134.   Where the Government takes on or has control or supervision over the Trust Funds, a fiduciary relationship exists between the Government and the Nation with respect to such Trust Funds, and the obligation to manage the Trust Funds must, at a minimum, comport with statutory directives.

135.   25 U.S.C. § 4011 provides:

---

[7]   Until the United States provides an accounting to the Nation for the management of the Nation's Trust Funds the Nation cannot present a claim for the damages that may result from the United States' potential breaches of obligations to the Nation. Accordingly, no claim is presented for money damages in this action because the Nation has never been provided the accounting that would support such a claim. However, the Nation reserves the right to bring such a claim for money damages in the future should an accounting demonstrate such a claim or claims to be appropriate, and if restitution of the Cherokee Trust fund in this litigation does not provide complete relief to the Nation for the United States' refusal to account.

a) Requirement to account

The Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to The Act of June 24, 1938 (25 U.S.C. 162a).

(b) Periodic statement of performance

Not later than 20 business days after the close of a calendar quarter, the Secretary shall provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited or invested pursuant to The Act of June 24, 1938 (25 U.S.C. 162a). The statement, for the period concerned, shall identify--
    (1) the source, type, and status of the funds;
    (2) the beginning balance;
    (3) the gains and losses;
    (4) receipts and disbursements; and
    (5) the ending balance.

(c) Annual audit

The Secretary shall cause to be conducted an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to The Act of June 24, 1938 (25 U.S.C. 162a), and shall include a letter relating to the audit in the first statement of performance provided under subsection (b) of this section after the completion of the audit.

136.   Interior has failed to provide to the Nation any of the accounting required by 25 U.S.C. § 4011 and 25 U.S.C § 4044, and the United States has failed to provide the accounting required by the Treaties, agreements, and statutes as set out herein.

137.   The Nation is seeking an Order from this Court whereby the United States is required to provide an accounting of Trust Funds that are held or have been held by the United States *qua* trustee for the Nation as required by treaties, agreements, and statutes.

###### B.    MANAGING ASSETS IN THE NATION'S BEST INTERESTS

138. Interior generally, and its sub-agencies specifically, have been and are currently charged with the trust responsibility for managing the Nation's Trust Funds.

139. None of the requirements set out in 25 U.S.C. § 162a have been or are adequately being implemented by Interior. These obligations include, without limitation, those set out herein.

140. Interior has not and is not providing adequate systems for accounting for and reporting on the Nation's financial balances, including the accrual of proper amounts of interest.

141. Interior has not and is not providing adequate controls over receipts and disbursements from the Nation's accounts that are managed or controlled by Interior.

142. Interior has not and is not providing the Nation with periodic, timely reconciliations to assure the accuracy of accounts.

143. Interior has not and is not determining accurate cash balances in the Nation's accounts, including the accrual of proper amounts of interest.

144. Interior has not and is not preparing and supplying the Nation with periodic statements of its account performance and with balances of its account available on a daily basis.

145. Interior has not and is not establishing consistent, written policies and procedures for trust fund management and accounting for the Nation's accounts

146. Interior has not and is not providing adequate staffing, supervision, and training for trust fund management and accounting for the Nation's accounts.

147. Interior has not and is not appropriately managing the Nation's natural resources.

148.   The Nation has substantial interests in Trust Funds that are and have been held, and managed by the United States.   These interests were obtained variously by treaty, other agreements, or by congressional action.   The United States' failure to properly manage the Tribe's trust assets, accounts and funds, coupled with Interior's refusal to provide a complete accounting of the federal management Trust Funds in the best interest of the Cherokee Nation, constitutes a breach of Defendant's trust responsibility to the Tribe.

149.   As a remedy, the Nation seeks an injunction requiring that the United States:

(1)   Provide the Nation with as full and complete an accounting as possible of the Nation's funds, assets and natural resources to the earliest possible date.

(2)   Provide adequate systems for accounting for and reporting the Nation's trust fund balances.

(3)   Provide adequate controls over receipts and disbursements from the Nation's funds that are managed or controlled.

(4)   Provide periodic, timely reconciliations to assure the accuracy of accounts managed or controlled for the Nation by the United States.

(5)   Determine accurate cash balances in the Nation's accounts that are managed by the United States.

(6)   Prepare and supply the Nation with periodic statements of its account performance and with balances of its account and make such statements available on a daily basis.

(7)   Establish consistent, written policies and procedures for trust fund management and accounting of the Nation's accounts.

(8)   Provide adequate staffing, supervision, and training for trust fund management and accounting for the Nation's accounts.

(9)   Appropriately manage the natural resources located within the boundaries of the Cherokee Nation in accordance with statutory and regulatory requirements.

(10)   Restore those Cherokee Trust Funds for which the United States cannot account.

## THIRD COUNT:
## ACCOUNTING AS AN ADMINISTRATIVE PROCEDURE ACT CLAIM

150.   Paragraphs 1 through 149 are incorporated by reference.

151.   Interior has not and is not providing adequate systems for accounting for and reporting the Nation's trust fund balances.

152.   Interior has not and is not providing adequate controls over receipts and disbursements from the Nation's accounts that are managed or controlled by Interior.

153.   Interior has not and is not providing the Nation with periodic, timely reconciliations to assure the accuracy of accounts.

154.   Interior has not and is not determining accurate cash balances in the Nation's accounts.

155.   Interior has not and is not preparing and supplying the Nation with periodic statements of its account performance and with balances of its account available on a daily basis.

156.   Interior has not and is not establishing consistent, written policies and procedures for trust fund management and accounting for the Nation's accounts.

157.   Interior has not and is not providing adequate staffing, supervision, and training for trust fund management and accounting for the Nation's accounts.

158.   Interior has not and is not appropriately managing the Nation's natural resources.

159.   Interior has not provided the Nation with as full and complete accounting as possible of the Nation's funds to the earliest possible date.

46

160.   Because the United States breached any and each of these duties set out herein as well as other obligations specifically set forth in treaties, other statutes, regulations, and orders, the United States, through its agencies and sub-bureaus has acted contrary to statutory obligations and the Plaintiffs are entitled to review thereof under 5 U.S.C. § 702.

161.   Accordingly, the United States, through its agencies and sub-bureaus has acted arbitrarily, and capriciously, and such action constitutes final agency action and the withholding of agency action that is required.

162.   As a remedy, the Nation seek an injunction requiring that the United States:

(1)   Provide the Nation with as full and complete accounting as possible of the Nation's funds, assets and natural resources to the earliest possible date.

(2)   Provide adequate systems for accounting for and reporting the Nation's trust fund balances.

(3)   Provide adequate controls over receipts and disbursements from the Nation's funds that are managed or controlled.

(4)   Provide periodic, timely reconciliations to assure the accuracy of accounts managed or controlled for the Nation by the United States.

(5)   Determine accurate cash balances in the Nation's accounts that are managed by the United States.

(6)   Prepare and supply the Nation with periodic statements of its account performance and with balances of its account and make such statements available on a daily basis.

(7)   Establish consistent, written policies and procedures for trust fund management and accounting of the Nation's accounts.

(8)   Provide adequate staffing, supervision, and training for trust fund management and accounting for the Nation's accounts.

(9)    Appropriately manage the natural resources located within the boundaries of Indian reservations and trust lands in accordance with statutory and regulatory requirements.

(10)   Restore those Cherokee Trust Funds for which the United States cannot account.

## RELIEF REQUESTED

Wherefore, the Nation requests the relief set out herein.  The Nation also requests that this Court order Defendants to make whole, restore, replenish, reconstitute, or repair the Trust Funds wasted, lost, or unaccounted for by the Government.  The Nation also seeks its costs of suit including, without limitation, attorneys' fees under the Equal Access to Justice Act and under general principles of law and equity, and the fees and costs of expert assistance.  The Nation also requests that this Court provide all other relief as this Court deems necessary and equitable.

Respectfully submitted this
28th Day of November, 2016,


Todd Hembree, OBA No. 14739
Attorney General
Chrissi Nimmo, OBA No. 22248
Assistant Attorney General
Chad Harsha, OBA No. 31579
Assistant Attorney General
Courtney Jordan, OBA No. 31982
Assistant Attorney General
John Young, OBA No. 31889
Assistant Attorney General
THE CHEROKEE NATION OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 948
Tahlequah, OK 74465-0948
Tel – 918-456-0671
Fax – 918 – 458-5580
Email -      todd-hembree@cherokee.org


Sara Elizabeth Hill, OBA No. 20072
Secretary of the Environment and Natural
Resources
CHEROKEE NATION OFFICE OF THE
ENVIRONMENT AND NATURAL RESOURCES
P.O. Box 948
Tahlequah, OK 74465-0948
Tel - 918-207-3836
Fax - 918-458-6142
Email -      sarah-hill@cherokee.org

David F Askman, CO Bar No. 44423
Michael Frandina, CO Bar No. 42116
**ASKMAN LAW FIRM LLC**
1543 Champa Street, Suite 400
Denver, Colorado 80202
Tel - 720-407-4331
Email-      dave@askmanlaw.com
            michael@askmanlaw.com


Michael Goodstein, DC Bar No. 469156
Anne Lynch
Toby Munoz
**HUNSUCKER GOODSTEIN, PC**
5335 Wisconsin Ave. N.W.
Suite 360
Washington, DC 20015
Tel - 202-895-5380
Email -     mgoodstein@hgnlaw.com
            alynch@hgnlaw.com


Jason B. Aamodt, OBA No. 16974
Deanna Hartley, OBA No. 19272
Krystina E. Phillips, OBA No. 30111
Dallas L.D. Strimple, OBA No. 30266
**INDIAN AND ENVIRONMENTAL LAW GROUP**
204 Reunion Center
Nine East Fourth Street
Tulsa, Oklahoma 74103
Tel – 918-347-6169
Email -     jason@iaelaw.com
            deannaa@iaelaw.com
            krystina@iaelaw.com
            dallas@iaelaw.com