# In the United States Court of Federal Claims

No. 17-359 L
(Filed: January 5, 2018)

```
*************************************
                                    *
WHITE MOUNTAIN APACHE TRIBE,        *
                                    *
                Plaintiff,          *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                Defendant.          *
                                    *
*************************************
```

*Brian W. Chestnut*, Attorney of Record, *Beth Baldwin* and *Wyatt Golding,* Of Counsel, Ziontz Chestnut Law Firm, Seattle, WA; together with *Jim Palmer,* Attorney General, White Mountain Apache Tribe, Whiteriver, AZ, for Plaintiff.

*Matthew M. Marinelli*, Attorney of Record, *Jacqueline Leonard* and *Anthony P. Hoang*, Of Counsel, *Jeffrey H. Wood*, Acting Assistant Attorney General, U.S. Department of Justice, Environmental, and Natural Resources Division, Natural Resources Section, Washington, DC; *Kenneth Dalton*, *Michael Bianco*, *Joshua Edelstein*, Officer of the Solicitor, U.S. Department of the Interior, Washington, DC; *Thomas Kearns*, Office of the Chief Counsel, Bureau of the Fiscal Service, U.S. Department of the Treasury, Washington, DC, for Defendant.

**OPINION AND ORDER**

**DAMICH**, Senior Judge.

This case arises from an alleged breach of fiduciary duties by the United States against the White Mountain Apache Tribe ("Tribe"). In its Complaint, filed on March 15, 2017, the Tribe alleges that the United States breached its fiduciary duties through mismanagement of trust funds from 1946 to the present, non-monetary trust assets from 1946 to the present, and dam maintenance and repair from time of construction to the present.

The Government responded on July 14, 2017 with a partial motion to dismiss portions of count I and II under RCFC 12(b)(1) and to dismiss all of count III under RCFC 12(b)(6). The Government argues that portions of count I (trust assets) and count II (non-monetary assets) arising before March 15, 2011 are time barred by the six-year

1

statute of limitations. Additionally, the Government argues that count III (dam maintenance) should be dismissed entirely for failure to state a claim.

On September 15, 2017 the Tribe filed their Response. The Tribe argues that the United States exerts near-total control of the Tribe assets, that record keeping has been far from adequate, and that the facts are highly complex. Therefore, the Tribe proposes limited discovery, consistent with other decisions in this Court related to similarly complex cases, to address the statute of limitations or other jurisdictional issues based on a more complete factual record. Furthermore, the Tribe argues the dam claim is sufficiently plead to state a claim.

For the reasons set forth below, the Court hereby **DENIES** the Government's Partial Motion to Dismiss Count I, **GRANTS IN PART** the forestry mismanagement and grazing portion of Count II and **DENIES IN PART** the remaining portions of Count II, minerals, contamination, rights-of-way, and leases, without prejudice for the purpose of limited discovery on the question of when the Tribe knew or should have known of the Government's alleged breaches of fiduciary duty; and **DENIES** the Government's Motion to Dismiss Count III.

### I.     BACKGROUND FACTS

The Tribe is a federally recognized tribe and resides on the Fort Apache Indian Reservation in eastern Arizona which covers an area of approximately 1.67 million acres, making it the eleventh largest Indian reservation in the United States. Title to all the Reservation's land and natural resources, except for approximately 45 acres, is held in trust by the United States for the use and benefit of the Tribe. The Reservation has a variety of natural resources, including timber and irrigable agricultural land. The Reservation includes 598,000 acres of accessible commercial timberland and 467,000 of accessible commercial woodlands. The Tribe owns and operates a saw mill. The Tribe also benefits from recreational visitors who enjoy use of the lakes and rivers. The Tribe relies on the natural resources of the Reservation to provide employment and revenue.

In 1820, Congress began enacting laws authorizing the Secretary of the Interior to manage tribal trust property for the benefit of the Tribe. *See, e.g.*, 25 U.S.C. §§ 151 through 165 (deposit, care, and investment of Indian moneys); 25 U.S.C. § 413 & 25 U.S.C. §§ 3105, 3109 (authorizing forest management fee suspense accounts); 25 U.S.C. §§ 4001 through 4061 (establishing reporting and management requirements for Indian moneys in the American Indian Trust Fund Management Reform Act); Title 31 of the United States Code (United States Treasury statues).

The statutes and regulations defining the United States' duties in managing tribal trust funds create specific fiduciary duties that provide for compensation for damages in the event of the breach of these duties. *See, e.g., Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726, 738-39 (2011) (holding that the court had jurisdiction over claims based upon a breach in fiduciary duty "to maximize trust income by prudent investment"). The United States promulgated regulations that, for example, describe

2

duties in managing the Tribe's trust funds and forests.  *See, e.g.*, 25 C.F.R. chapter I, subchapter G (Financial Activities); 25 C.F.R. Part 1200 (American Indian Trust Fund Management Reform Act regulations); and 25 C.F.R. Part 163 (forestry regulations governing administration of forest suspense accounts held in trust).

The Tribe's land and natural resources, to include the timberland, are held in trust by the United States.  25 U.S.C. § 162 a(d)(8).  Congress has delegated authority and responsibility to oversee the use of Tribal lands including the timber and other natural resources.  *Id.* (stating duty to appropriately manage all trust lands within a reservation); *see also* 25 U.S.C. §§ 3101 through 3120 (National Indian Forest Resources Management Act); 25 U.S.C. §§ 3801 through 3804 (Indian Dams Safety Act).

The Secretary of the Interior, manages the Tribe's land, timber, and other non-monetary assets, approves leases, rights-of-way, and grants of other interests in the Tribe's lands.  The United States deposits, manages, and invests the income generated by the Tribe's trust assets.

As trustee, the United States has the obligation to ensure that tribal funds and trust property are "protected, preserved and managed so as to maximize the trust income to the beneficiary by prudent investment." Compl. at 9.  In fulfilling this obligation, an accounting report was provided to the Tribe in 1975 pursuant to an order by the Indian Claims Commission.  This accounting covered the time period from 1897 to 1946 and provided the basis for a lawsuit by the Tribe.  *White Mountain Apache Tribe v. United States*, 4 Cl. Ct. 586, 587 (1984). The tribe alleged that since creation of the reservation, the government administered the water, rangeland, and timber resources for its own purposes and not for the benefit of the Tribe and brought the action pursuant to the Indian Claims Commission Act, 25 U.S.C.S. §70a for mismanagement of its tribal resources. *White Mountain Apache Tribe v. United States*, 11 Cl. Ct. 614, 618-619 (1987).  In relevant part, the Court held, in the 1987 opinion, that the Tribe was entitled to monetary damages from the Government for breaches of fiduciary duties in managing the Tribe's rangeland and forest resources by overgrazing and over-cutting related to one portion of the forest.  *Id.* at 680-81.

In 1990, Congress requested that the Secretary of the Interior provide periodic independent assessments of Indian forest lands and forest management.  25 US.C. § 3111(b).  In 1993, 2003, and 2013 reports were prepared in accord with 25 U.S.C. § 3111 by the Indian Forest Management Assessments Team ("IFMAT") to provide an independent assessment of Indian forest lands and land management practices.

Additionally, Congress mandated that all Indian trust forest lands be managed under an approved Forest Management Plan ("FMP") with the objectives to develop, maintain, and enhance the Indian forest land in accordance with the principles of sustained yield and "with the full and active consultation and participation of the appropriate Indian tribe." 25 CFR 163.3(b)(1) and (2).

3

In 1994, Congress passed the Indian Dam Safety Act ("IDSA"). IDSA required the United States to conduct a survey of dams on tribal lands, document which dams were in need of repair, and develop a plan to repair those dams found to present a "high hazard" or "substantial hazard" to avoid future threats to human life and property. 25 U.S.C. § 3801. There are 12 "high hazard" dams and 2 "substantial hazard" dams on the Tribe's lands. The Tribe alleges that "[o]nly a few" of the 12 "high hazard" dams have been repaired by the Government. Compl. at 18. During the repair of the Davis Dam, the Hawley Lake, a source of tourism revenue for the Tribe, was allegedly unnecessarily drained "decimating the fishery and the local tourism economy." Compl at 19.

Also in 1994, Congress requested the Secretary of the Interior to provide timely and accurate reconciliations of tribal trust funds, audit all tribal trust funds annually, and effectively manage and discharge its trust responsibilities through the appointment of a Special Trustee for American Indians. American Trust Fund Management Reform Act of 1994, Pub. L. No. 103-412, 108 Stat. 4239 *et seq.*, codified at 25 U.S.C. §§ 4001-4061. Further, Congress required periodic statements of performance ("PSPs") for the tribal trust fund assets beginning in 1995 on a prospective basis. *See* Section 4011 of the 1994 American Indian Trust Fund Management Reform Act.

In 1996, the United States General Accounting Office ("GAO") issued a report on the Bureau of Indian Affairs' ("BIA") efforts to reconcile and certify tribal trust accounts. The report concluded that although the BIA had made a "massive attempt" to reconcile accounts, missing records and system limitations made a full reconciliation impossible. U.S. Gov't Accountability Off., GAO/AIMD-96-63, Report to the Committee on Indian Affairs, U.S. Senate, *Financial Management: BIA's Tribal Trust Fund Account Reconciliation Results*, Rep. No. B-266127 (May 1996) ("GAO 1996 Report").

The Tribe filed this breach of fiduciary duty case against the United States on March 15, 2017. Each of the three counts will be reviewed individually but the discussion will begin with Count II, non-monetary assets and in particular, forestry mismanagement, due to the robustness of the arguments in the briefs surrounding this issue.

## II. DISCUSSION

### A. Motion To Dismiss Pursuant to RCFC 12(b)(1)

Subject matter jurisdiction may be challenged at any time by the parties. *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993). The burden of establishing the Court's subject matter jurisdiction rests with the Plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). When faced with a motion to dismiss for lack of subject matter jurisdiction, the Court must assume that all undisputed facts alleged in the complaint are true, and it must draw all reasonable inferences in the Plaintiff's favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The Court may look to evidence outside of the pleadings in order to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991).

**1. Count II: Non-Monetary Trust Assets Related to Forestry Mismanagement. The Statute of Limitations Bars Claims that Accrued Prior to March 15, 2011; Therefore, No Discovery is Necessary with Regard to These Claims.**

Under the Tucker Act, the United States Court of Claims has jurisdiction over claims by Indian tribes brought against the United States arising under the Constitution, its laws or regulations. 28 U.S.C. §§ 1505. The statute of limitations for Indian claims is six years from the time the claim first accrues. 28 U.S.C. § 2501. Thus, on its face, it appears that the Statute of Limitations bars claims that accrued prior to March 15, 2011. The parties disagree on when the claims accrued. The Tribe argues that discovery is necessary to determine when the forestry mismanagement claims actually accrued.[1]

The Government argues that accrual occurs when the operative facts exist and are not inherently unknowable. *See Menominee Tribe v. United States*, 726 F.2d 718, 720-22 (Fed. Cir. 1984) (holding that the forest mismanagement claims were time barred as there was no concealment by the defendant to toll the statute of limitations). An exception arises only when a tribe is knowingly prevented "from being aware of the material facts that gave rise to their claim." *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 672 F.3d 1021, 1031 (Fed. Cir. 2012). Here, it is the Government's argument that the exception is not applicable since the Tribe would have knowledge of its forests and its management.[2] Therefore, the tribe's prior forest mismanagement claims (specifically, the 1987 lawsuit and the forestry reports noted previously) make it clear that the Tribe had actual knowledge of the facts underlying the current claims.

In contrast, the Tribe responds that because this case involves a breach of trust, the accrual date is "when the trustee 'repudiates' the trust *and* the beneficiary has knowledge of that repudiation." *Shoshone*, 672 F.3d at 1030 (emphasis in the original). Thus, because the Government did not expressly repudiate the trust, the Tribe argues that discovery is necessary to ascertain when the claims did in fact accrue.

However, the Court notes that the Tribe is selectively picking the standard from *Shoshone*. The court in *Shoshone*, most certainly stated that the trustee must repudiate

---

[1] In some similar cases with complex claims related to breach of fiduciary duty in managing forests on Indian reservations, other judges in this Court first denied the Government's motion to dismiss permitting discovery to more fully develop the factual record. *See, e.g., Apache Tribe of the Mescalero Reservation v. United States*, 43 Fed. Cl. 155 (1999); *see also San Carlos Apache Tribe v. United States,* No. 14-1045 (Fed. Cl. July 31, 2015).

[2] "[A] landowner will be deemed to be on inquiry of activities that are openly conducted on his property." *Ingrum v. United States*, 560 F.3d 1311, 1316 (Fed. Cir. 2009) (where activities are open and notorious, the claimant is "on inquiry as to its possible injury."). The Tribe describes its forests and timberland as accessible in the Complaint. Compl. ¶13.

5

the trust and the beneficiary must be aware of the repudiation, but the Court further stated that a "trustee may repudiate the trust by taking actions inconsistent with his responsibilities as a trustee or by express words." *Shoshone*, 672 F.3d at 1030. Thus, in reading the entire standard as provided by the Federal Circuit, repudiation does not require a trustee to report a breach of its fiduciary duties as suggested by the Tribe but may by its actions, say, by failing to properly manage the forest assets, repudiate the trust.

Furthermore, in *Hopland Band of Pomo Indians*, another case cited by the Tribe to bolster its argument, the opinion begins by noting that (1) claims accrue when events have occurred that "entitle the plaintiff to institute an action;" *and* (2) statues of limitations apply to tribes "in the same manner as against any other litigant." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-78 (Fed. Cir. 1988) (emphasis added).

And finally, the Tribe's argument that it is exempted from the statute of limitations due to the complexity of forest management is refuted by, for example, *Mitchell v. United States*, which opined that "whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice of everything to which such inquiry might have led." *Mitchell v. United States*, 10 Cl. Ct. 63, 68-71 (1986) (holding that where Indians knew or had reason to know of the Government's alleged mismanagement they knew enough to have begun an investigation as "there is no legally acceptable basis for excusing the lack of timely pursuit of rights."). In contrast to the individual Indian plaintiffs in *Mitchell*, this case involves a Tribe that was involved in its forestry management and previously litigated similar claims of breaches of fiduciary duty against the Government.

Thus, the Court's jurisdictional statute of limitations of six years from accrual of the claim remains applicable and the Court is, therefore, tasked with determining when the claims accrued.

### a. The Tribe's Prior Forest Mismanagement Claims make it clear the it had Actual Knowledge of the Facts underlying its Current Claims

Previously, in 1987, the Tribe brought action against the Government alleging breaches of the Government's duties in managing the Tribe's water rights, rangeland, and forest resources. During trial, the Tribe's expert witnesses provided evidence of forest mismanagement. *White Mtn Apache Tribe* v. *United States*, 11 Cl. Ct. 614, 618 (1987). Additionally, the trial judge visited the site and in his opinion noted that his observations "gave vivid context to the Government's past timber harvesting and current forest management practices." *Id*. at 621. Yet, in the current case, it is the Tribe's contention that trial focused on pre-1946 conduct and that the case largely dealt with water resources and rangeland, albeit some forestry allegations were included as they related to the sawmill expansion. *Id*. at 618. This, contends the Tribe, did not give rise to actual knowledge of forest mismanagement triggering the statute of limitations.

6

The Tribe's efforts to minimize the 1987 trial are unavailing. In the 1987 opinion, the trial judge wrote "[the] plaintiff devoted a considerable portion of its presentation to post-1946 timber harvest and management plans in an attempt to link all forest management events from before 1946 through the present." *Id*. at 679. It is clear that the Tribe presented evidence of its forest and management practices during its 1987 case and, thus, the facts underlying its current claims related to forest mismanagement. Therefore, the date of accrual for forest mismanagement claims was as early as 1987. Using this date, the claims would have had to have been brought no later than 1993.

Even so, the Tribe contends that the previous litigation has no bearing on accrual because forest claims are "highly technical and necessitates extensive work by qualified experts." Pl. Opp. at 13. However, even highly technical claims accrue where plaintiffs are "capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim." *Menominee Tribe*, 726 F.2d at 721. The 1987 trial shows that at a minimum, Plaintiff was capable of retaining experts to evaluate its forests in 1987. This is fatal to the Tribe's pre-1987 claims.

### b. The Tribe's Assertions with Regard to Forestry Reports Show that the Tribe knew the Material Facts before 2011.

In its Complaint, the Tribe bases its forest resource mismanagement claims on the Indian Forest Management Assessments Team ("IFMAT") reports published in 1993 and 2003 as well as a 2005 forest management plan. Compl. ¶¶ 42-51. The Tribe argues that it referenced the 1993 and 2003 reports for generalized evidence of forest mismanagement by the Government on tribal lands. As the 1993 and 2003 reports do not state that the Government repudiated or breached its fiduciary duty, the Tribe argues that the reports did not set forth sufficient facts to establish a breach on a specific reservation. Additionally, the Tribe argues that the reports merely determined the scope of the Government's trust obligation. Thus, the reports are only a resource that the Tribe will rely upon for background context in these proceedings and not an indication that the Tribe "knew or should have known" of breaches of fiduciary duty based on the availability of the 1993 and 2003 reports. Furthermore, the Tribe maintains that it was in fact the FMAT report of 2013 that stated the United States generally breached its fiduciary obligations to Indian tribes that put the Tribe on notice of a possible breach. According to the Tribe, this is the date when the claims first accrued.

The Court is not persuaded. The Tribe's discussion of the 1993 and 2003 reports demonstrates that it was aware of sufficient facts related to the Government's mismanagement of its forest to trigger a duty to investigate. *See Mitchell*, 10 Cl. Ct. at 71-72, *Shoshone*, 672 F.3d at 1030-33. Therefore, the Tribe's pre-2011 forest management claims accrued before 2011 and are barred by the statute of limitations.

Additionally, the Tribe insists that the Reservation's 2005 Forest Management Plan ("FMP") covered a ten year period and detailed plans to fix identified forestry problems. Therefore, it was only after the ten year period ended in 2014, that the Tribe could assess the success or failure of the forest management plan on. Thus, the Tribe

7

contends that discovery is necessary to fully develop the factual record. After the record is developed, the Tribe requests permission to then amend its Complaint.

The 2005 report put the Tribe on notice of its forest mismanagement claims. The Complaint reads:

> For example, the 2005-2014 Forest Management Plan estimates an annual loss of approximately $800,000 due to mistletoe infection. The Forest Management Plan also estimates that the Tribe has lost over 100 million board feet of timber to spruce beetle….

Compl. ¶ 51. This admission by the Tribe discloses that it was aware of facts relating to its forest mismanagement claims. The 2005 Plan indicates that it knew of the damage to the Tribe's forest. This knowledge put the Tribe on notice of possible claims. The claims therefore started to accrue regardless of whether Plaintiff knew the full extent of any such damage. *Wolfchild v. United States*, 731 F.3d 1280, 1291 (Fed. Cir. 2013) (because the claimants knew or should have known the claims, a final accounting is unnecessary to put the claimants on notice of the accrual of their claim). Therefore, a final accounting was not necessary for the claims to accrue.

As such, the Tribe knew or should have known of the alleged breaches of fiduciary duty and the conduct was not concealed or inherently unknowable to the extent warranting a tolling of the statute of limitations. Here, as evidenced above, the Tribe "[was] capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim" *Menominee Tribe*, 726 F.2d at 721. Therefore, the Court holds that the forestry claims portion of Count II prior to March 15, 2011 are time barred and the Government's partial motion to dismiss is granted.

### 2. Count II: Non-Monetary Trust Assets Related to Grazing/Rangeland-Minerals, Contamination, Rights-of-Way and Leases, Government's Motion to Dismiss is Granted in Part and Denied in Part

Count II's claim of breach of fiduciary duty involving non-monetary trust assets, includes not only alleged forestry mismanagement, but also alleged mismanagement related to grazing, minerals, contamination, rights-of-way, and leases on the Reservation. The Government argues that, as with forestry mismanagement, these other non-monetary asset mismanagement claims are similarly knowable prior to March 15, 2011 and thus are time barred by the statute of limitations. The Government treats the grazing portion of Count II differently, so it will be addressed first and then the remainder of the non-monetary assets will be addressed.

#### a. Partial Motion to Dismiss Grazing/Rangeland Portion of Count II that Accrued Prior to March 15, 2011 is Granted

The Government argues that the 1987 case by this Tribe against the United States referenced *supra* with respect to forest claims also focused on alleged overgrazing, and

8

thus the management and condition of the Tribe's rangeland was knowable. *See White Mountain Apache Tribe*, 11 Cl. Ct. at 618, 647-67. The trial focused on alleged overgrazing and the Tribe put on evidence showing that the overgrazing caused erosion and deterioration of its land. Therefore, portions of the grazing claims are time barred since the condition of the Tribe's rangeland was knowable prior to March 15, 2011.[3]

The Tribe does not specifically respond to the grazing portion of the claims and generally argues the Government as trustee has knowledge but has failed to fully inform the Tribe and thus discovery is necessary to more fully develop this claim like the other portions of Count II.

The Court agrees with the Government that, similar to the forestry claims, the prior case should have provided notice enough to excite attention to warrant investigation of further claims regarding grazing. In the Tribe's own words (referencing the 1987 case) "[t]he bulk of the case concerned mismanagement of water resources *and rangeland*." Plt. Resp. to Govt Mot. to Dismiss at 12 (emphasis added). Therefore, the Court grants the Government's partial motion to dismiss the grazing portion of Count II prior to March 15, 2011.

### b. Partial Motion to Dismiss Minerals, Contamination, Rights-of-Way, and Leases Portion of Count II is Denied

Regarding the remaining non-monetary assets mismanagement claims, the Government argues that the Complaint failed to allege sufficient facts to establish this Court's jurisdiction. The Government argues that the Complaint makes only passing reference to alleged claims regarding minerals, contamination from pollution or hazardous material, rights-of-way, and leases. The Government argues the Complaint fails to describe the legal or factual basis for these claims.

The Tribe counters that at this stage of litigation more details are not required. The Tribe argues that regarding third parties occupying Reservation lands, the Government has failed to enforce applicable laws, leases, and rights of way. The Complaint describes rights of way that have expired and that third parties have contaminated the Reservation. Compl at ¶¶ 11-15, 23, 27, and 28. Furthermore, the Tribe argues that the Government controls much of the information related to all of these claims. Thus, the tribe needs "more information to further specify its expired rights of

---

[3] Furthermore, the Government argues that the Tribe may not rely on the Appropriations Acts to toll the statute of limitations regarding the non-monetary trust asset mismanagement claims. The tolling provisions were specifically related to trust fund mismanagement claims until a tribe received an accounting of those funds. The tolling provisions does not relate to non-monetary assets described in Count II. *See Shoshone Indian Tribe of the Wind River Reservation v. United States*, 672 F.3d 1021, 1034 (Fed. Cir. 2012). Therefore, the Government concludes the Tribe has no right to "sleep on their claims for decades" as Congress has established a six-year statute of limitations for claims against the government. Govt. Mot. to Dismiss at 25.

9

way claim" and "[t]hrough discovery, the Tribe intends to determine the status and nature of the Reservation rights of way and contamination so it can specify claims in detail based on the legal duties of the Government to enforce applicable law." Plt. Resp. to Govt. Mot. to Dismiss at 22-23.

The Court begins by noting that the factual record related to the other non-monetary assets is not as thoroughly developed in the briefs as the forestry and rangeland claims. Therefore, the Court is willing to indulge the Plaintiff's request for limited discovery on the non-monetary asset claims of breach of fiduciary duty involving minerals, contamination, rights-of-way, and leases. The Court thus denies without prejudice the Government's partial motion to dismiss the other non-monetary assets portions of Count II related to minerals, contamination, rights-of-way, and leases.

### 3. Count I: The Statute of Limitations Does Not Bar the Tribe's Trust Fund - Claims at this Stage

Turning now to Count I, trust fund mismanagement, the Government again argues that the portions of the claim that pre-date March 15, 2011 are time barred. The Government argues that in 1994 Congress resolved the tribal trust fund issues by requiring the BIA to perform and provide reconciliation reports to all tribes looking backward in time and periodic statements of performance ("PSPs") looking forward in time beginning in 1995. From the reconciliation report and the PSPs, the tribes could determine a loss and if necessary file a claim against the United States.

The Tribe counters that it has not been put on notice of its claims since it has not received a "meaningful" accounting from which it can determine a loss. Therefore, its trust fund claims do not accrue until the Tribe receives an accounting from which it can determine if a loss has occurred. *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1347 (Fed. Cir. 2004). The Tribe argues that the GAO acknowledged that a complete reconciliation report was impossible, that in general the record keeping for trust funds was very poor, and too limited to constitute an accounting. *See* GAO 1996 Report.[4]

Next the Government argues that Congress used Appropriation Bills to toll the statute of limitations related to trust fund claims through December 31, 2006 to give tribes time to investigate claims. *See* § 4011 of the 1994 American Indian Trust Fund Management Reform Act. Therefore, the Government argues the Tribe was provided fifteen years of information through its PSPs, time enough to investigate a possible claim.

---

[4] Furthermore, being the eleventh largest reservation with revenue provided through management of resources such as forestry, grazing, commercial leases, and rights-of-way, the record keeping is not only complex but controlled exclusively by the Government. Again, although Congress required an accounting, that task proved impossible as records were lost and destroyed according to the GAO. *See* GAO 1996 Report.

10

The Government notes that while Congress permitted the tolling provisions,[5] 115 tribes brought trust fund accounting and mismanagement claims against the United States. Finally, the Government argues that the 2014 Act "expired" by the time the Tribe filed its claim in 2017.

The Tribe responds that special rules apply to tribal trust fund claims involving the Appropriation Bills. Congress' passing of the Appropriation Acts, continue to toll the statute of limitations for losses or mismanagement of trust funds until an accounting is provided such that a tribe may determine if a loss has occurred. Congress has repeatedly included language for tolling such as in the 2014 Act discussed by the Government:

> notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected Indian tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss

*See e.g.*, Department of the Interior Appropriations Act of 2014, Pub. L. No. 113-76, Div. G, Title I, 128 Stat. 305-06 (Jan. 17, 2014). The Tribe persuasively argues that the plain language of the Act does not limit claim filings to the year in which the Act was enacted but rather that the tolling does not begin until the Tribe receives an accounting.

Regarding the PSPs, the Tribe argues these documents do not demonstrate whether amounts were, for example, properly collected and managed nor do they demonstrate the adequacy of the chosen investment strategies. The PSPs do not provide the Tribe with knowledge of a loss. In another Indian tribe trust fund mismanagement case, another judge from this Court held that disclosures similar to the PSPs were not accountings sufficient to put a tribe on notice of its claims and thus begin the running of the statute of limitations. *See Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,* 69 Fed. Cl. 639, 664 (2006) (reviewing a 34 page financial report that provided information only looking forward in time, submitted by the Defendant as evidence of an accounting, did not constitute a "meaningful" accounting). Thus, the Tribe argues it has not received a reliable or complete accounting from 1946 to the present from which to determine if it has suffered a loss and as such its claims have not accrued and are not time barred under the statute of limitations.

This Court agrees that the Tribe has not received a meaningful accounting from which to determine a loss. The plain language of the Appropriations Act "the statute of limitations shall not commence to run on any claim . . . until the affected Indian tribe . . .

---

[5] Congress tolled the statute of limitations for potential claims arising from the tribal receipt of trust reconciliation project results several times from 2002-2005. *See, e.g.*, An Act to Encourage the Negotiated Settlement of Tribal Claims, Publ. L. No. 107-153, 116 Stat. 79 (2002).

11

has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss" is clear. Therefore, the Court denies the Government's partial motion to dismiss.

### B. Count III: Motion To Dismiss Pursuant to RCFC 12(b)(6) is Denied

The Government argues the Tribe's dam safety claim fails for three reasons (1) failure to state a claim, (2) failure to identify the money-mandating language in Indian Tucker Act parlance, and (3) because the Tribe lacks standing to bring speculative future claims.

Pursuant to RCFC 12(b)(6), the Court is required to grant the Defendant's motion to dismiss if it finds the Plaintiff has failed to state a claim upon which relief can be granted. In considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all of the allegations in the complaint" and "must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). The Court must "treat all of the well-pleaded allegations of the complaint as true." *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). In order for a claim to be properly stated, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Pursuant to the Indian Tucker Act, the Court of Federal Claims possesses jurisdiction over certain claims against the United States by Indian tribes yet it does not itself create any substantive right. *United States v. Navajo Nation,* 556 U.S. 287, 289 (2009). The Supreme Court established a two-part test to determine whether this Court has jurisdiction over claims brought pursuant to the Indian Tucker Act. *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015). First, the plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed to faithfully perform those duties." *Id*. (quoting *Navajo Nation*, 556 U.S. at 290). Second, the plaintiff must demonstrate that "the substantive source of law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties" *Id.*; *See also Mitchell v. United States*, 463 U.S. 206, 226 (1983).

The Government first argues that the Complaint failed to describe a breach of trust claim and instead provides only conclusory allegations which are insufficient to state a claim upon which relief may be granted. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a complaint must include sufficient factual allegations and more than just conclusory statements "to raise a right to relief above the speculative level").

The Tribe counters that it has met the pleading standard established post *Twombly* that merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Dobyns v. United States*, 91 Fed. Cl. 412, 425 (2010). The Tribe

12

identifies in the Complaint the IDSA as the "substantive source of law that establishes specific fiduciary or other duties" and that the Complaint alleges that the Government failed in these duties. *See United States v. Navajo Nation*, 537 U.S. 488, 506 (2003). Additionally, the Tribe notes "[w]here one of the litigants is a government agency that has privileged access to information[,] a claimant must not be required, *ab initio*, to aver all or nearly all the facts subservient to its claims." *Id.* at 426-427.

Second, the Government argues that the Tribe failed to identify a money-mandating duty regarding dam maintenance. The Government argues that the IDSA, 25 U.S.C. § 3801 *et seq.*, does not impose on the BIA any specific duty to make repairs on any named dams and provides no specific deadlines for correcting maintenance deficiencies. The Government argues the IDSA merely establishes a process that the BIA might employ to assess and prioritize Indian dam repair needs with an ideal of maintaining all dams in satisfactory condition. The Government further argues that the Tribe's reliance on 25 U.S.C. § 162a(d)(8) is misplaced as that does not create a duty related to damages for dam maintenance but rather references management and investment of Indian trust funds.

In response, the Tribe counters that Congress through the language of the IDSA repeatedly commands that the government "shall" perform dam safety duties making those duties mandatory. *See e.g.*, 25 U.S.C. § 3803(a) ("The Secretary shall establish a dam safety maintenance and repair program"), 25 U.S.C. § 3803(c) ("the Secretary shall perform such rehabilitation work as is necessary to bring the dams identified . . . to satisfactory condition,"), 25 U.S.C. § 3803(d) ("The Secretary shall develop a maintenance action plan, which shall include a prioritization of actions to be taken"). Thus, the government has duties to repair and maintain the dams on the Tribe's lands. Consequently, the Tribe argues that a breach of these duties would result in compensation by the United States for damages sustained. *Mitchell*, 463 U.S. at 218 (instructing that "a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.").

Finally, the Government argues that the Tribe's claims are merely speculative and point to a future injury and thus the claim fails the Article III standing requirements of an "injury in fact" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 561.

The Tribe responds that the Government incorrectly views the Tribe's claim as sounding in tort with injury predicated on future events. The Tribe reiterates that Count III is a breach of fiduciary duty and thus as the beneficiary has constitutional standing to enforce the trust. The Tribe also argues that the IDSA was enacted by Congress for the benefit of the Indian tribes that have dams on their reservations and as described *supra* imposed mandatory fiduciary duties on the Secretary of the Interior with respect to those dams. As a Tribe with dams on its reservation, alleging a breach of fiduciary duties by the Secretary, the Tribe has standing to bring this claim.

13

The Court notes on its face the Complaint adequately states a breach of fiduciary duty claim. Specifically, the Complaint alleges under the IDSA, the United States has a fiduciary duty to manage, maintain, and repair the dams on the Reservation. Compl. at ¶61. The United States allegedly breached those duties because it failed to maintain dam safety while preventing waste while performing dam repairs. Compl. at ¶4, 64-65. Furthermore, the United States allegedly failed to perform proper maintenance on dams on the Reservation Compl. at ¶ 62 and has allegedly performed repair on only a few of the dams found to be "high-hazard" dams Compl. at ¶63. Under *Twombly*, in order to be entitled to relief, the factual allegations need not be detailed and must only be enough to rise "above the speculative level." *Twombly*, 550 U.S. at 555.

Furthermore, the Court agrees that through the IDSA Congress created mandatory duties on the part of the Government through the Secretary of the Interior regarding maintenance and repair of the dams on the Reservation. The Tribe as a beneficiary of the trust relationship created by the IDSA has standing. The Tribe has at this stage of litigation met the two part test to establish jurisdiction under the Indian Tucker Act. Therefore, the Court denies the Government's motion to dismiss Count III.

### III.  CONCLUSION

The Court hereby, **DENIES IN PART and GRANTS IN PART** the Government's Partial Motion to Dismiss. Specifically, the Government's Partial Motion to Dismiss Count I is **DENIED**. The Government's Motion to Dismiss Count III is **DENIED**. Under Count II, the Government's Partial Motion to Dismiss regarding forestry and grazing claims is **GRANTED**; regarding minerals, contamination, rights-of-ways, and leases, the Motion is **DENIED** without prejudice for the purpose of limited discovery on the question of what the Tribe knew or should have known of the Government's alleged breach of fiduciary duty. The Parties are directed to meet to confer and file a proposed litigation schedule within 30 days from the date of this order.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge

14